# Case No. 13,529.

## The STRATTON AUDLEY.

[3 Ben. 241.] [1]

District Court, S. D. New York. May, 1869. [2]

SALVAGE — CORPORATION —WORK AND LABOR— COSTS.

1. A British ship, worth, with her cargo, $250,000, in attempting to enter the port of New York, at night, lost sight of the coast lights in a snow squall. Her port anchor was let go, but the chain parted. Her starboard anchor was then dropped. She dragged some distance, but finally brought up at the edge of the Romer shoal, in 27 feet of water, the tide being high. She drew 19¼ feet aft, and, when the tide fell, there was but 21 feet of water under her, and, there being considerable sea on, her stern sometimes thumped heavily. About six o'clock the next morning, a steam-tug, owned by a corporation incorporated for the purpose of wrecking, came to her, and a conversation passed between the masters of the two vessels, in which the master of the tug said he would tow the ship off for $1000, and the master of the ship offered $500. It was finally agreed that the tug should render assistance, and that the amount of compensation should be left to arbitration. The tug then took hold of the ship, and, with the aid of another tug belonging to the same corporation, got the ship off about noon, parting a hawser several times in doing so, and brought her up to New York, arriving there about four o'clock p. m. The wind had shifted from the eastward to south and west about the time the first tug came up. The owners and masters of the two tugs filed a libel against the ship and her cargo, for themselves and all interested, claiming $25,000 salvage. It appeared that the masters and crews of the tugs were employed on fixed rates of compensation, and would receive no share of the recovery: Held, that the ship was in a condition to be the subject of a salvage service.

2. As the masters and crews were to have no share in the recovery, they must be wholly left out of the case.

3. The corporation could not claim as assignee in advance of what might otherwise be the claims of its hired servants for salvage.

4. The corporation itself could not be a salvor; what the law recognizes as the main element in a salvage service, namely, the impulse to boldness and heroism, being wholly wanting in the case of a corporation.

5. The corporation was entitled to a proper compensation for the use of its two steamers,

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]
[2] [Affirmed in Case No. 13,530.]

and of such of the appliances on board as were used in the service, without reference to the value of the ship and her cargo.

6. The hazard to the tugs was to be considered in fixing such compensation.

·7. $1,500 was ample compensation, and, as the claimants had offered, before suit brought, to pay $2,000 by way of compromise, no costs would be allowed to the libellants.

[Cited in The Plymouth Rock, 9 Fed. 417.]

In admiralty.

E. W. Stoughton and J. E. Parsons, for libellants.

E. C. Benedict and T. Scudder, for claimants.

BLATCHFORD, District Judge. This is a libel, filed by Thomas F. Marshall, master of the steamer Yankee, and David A. Wolcott, master of the steamer Rescue, and the·. Atlantic Submarine Wrecking Company, a. corporation created by the state of New York, and authorized to engage in the business of wrecking and of assisting vessels in danger and distress, and who were the owners of the said steamers. The libel is filed · by the libellants, for themselves and the · crews of the said steamers, and claims the · sum of $25,000, as a reasonable compensation, by way of salvage, or otherwise, for the services of the libellants and of the said crews in removing the ship Stratton Audley, a British vessel, and her cargo, from off the Romer shoal, near the entrance to the lower bay of the harbor of New York, where she was aground, on the 23d of March, 1869.

The answer gives substantially a correct version of the facts of the case, as they appear in evidence. The ship was bound from Calcutta to New York. She took a pilot off Barnegat Light about half past six o'clock in the evening of March 22d. At a quarter before eleven o'clock at night, while running for the bar at the entrance to the lower bay, she encountered a snow squall, which obscured the coast lights. Her port anchor was then let go, but the chain parted. Her starboard anchor was then dropped. She dragged for some distance with this, until she brought up in 27 feet of water. She drew 17¾ feet forward and 19¼ feet aft. The tide, which was very high, being driven in by an easterly wind, so that low water was as high as ordinary high-water, fell, while the vessel lay in this position, so that there came to be but 21 feet of water under her aft, and, as there was considerable sea on, she struck bottom, occasionally, near her stern, and, when she struck, thumped heavily. About six o'clock in the morning, the Yankee came within hail of the ship, and was asked by her master what the charge would be for towing the vessel off. Marshall, the master of the Yankee, asked, in reply, how much water the ship drew. The answer from the ship was, about 20 feet. Marshall asked how much water there was alongside of the ship. The answer was

about 21 feet. Marshall asked if she was not striking. The reply was, once in a while. Marshall then said he would tow the ship off for $1,000. The master of the ship said that was too much, and offered $500. The Yankee then drifted out of hailing distance. She soon came up again to the ship. The master of the ship then asked Marshall: "How much did you say?" Marshall replied "£2,000." The master said: "I understood you, dollars." "No," said Marshall, "I said pounds." It was then agreed that the Yankee should render her assistance, and that the amount of compensation should be left to arbitration. The Yankee then got a hawser to the ship, about six and a half ·o'clock a. m. The Rescue soon came up, and aided the Yankee in pulling, there being a hawser from the stern of the Rescue to the bow of the Yankee, and another hawser from the stern of the Yankee to the ship. The latter hawser, which belonged to the Yankee, and was a new one, eight inches in circumference, parted, and was put in place again, with another hawser, which belonged to the ship. The two were then pulled with until the ship's hawser broke. The pulling with the other hawser was continued, the ship being moved as the sea lifted her, until that hawser parted again. The hawser from the Rescue to the Yankee parted two or three times. The result was, that, by the use of hawsers, and hawsers alone, and the power of the two tugs, the ship was hauled off into deep water about noon, a space of six hours from the time the Yankee first reached her. She was towed by the tugs to New York, arriving there about four o'clock p. m. She was an iron vessel, and, so far as appears, was not injured or strained. When the Yankee reached the ship, it was the beginning of the ebb tide, and the wind had shifted from the eastward, and came out light from the south and west, but the sea did not abate. It was low water about 10 o'clock a. m., and about that time the wind got around to the west or northwest. The answer avers a willingness and readiness. on the part of the claimants, at all times, to submit to arbitration the question of the amount to be allowed· to the libellants for the service, as one of towage, but alleges that the libellants have, at all times, insisted on submitting their claim to arbitration as one of salvage. The claim is pressed upon the court by the libellants as one of salvage. The value of the ship and her cargo was $250,000. The value of the two steamers, at the time, was about $80,-000, and the value of the wrecking apparatus and material on board of them was about $50,000 more.

I think, on the evidence, that the peril to the ship at and after the time the Yankee reached her, has been very much exaggerated by the libellants. So, too, the danger to the steamers has been inadequately magnified, in order to enhance the value of the

service. But substantial service was rendered to the ship by the two steamers, and for that service a liberal, but at the same time a reasonable, compensation must be awarded. The ship was undoubtedly in a condition to be the subject of a salvage service, but, on the principles settled by the circuit court for this district, in the case of The Morning Star [Case No. 9,818], and applied by this court in the case of The J. F. Farlan [Id. 7,313], no salvage compensation for the service rendered in this case can be awarded to any of the libellants. The masters and crews of the steamers were hired on wages by the corporation, which owned the steamers and all the apparatus and material on board of them. They received those wages steadily, whether the steamers were employed or not. Their compensation for the services they rendered to this ship, and for the time occupied in rendering those services, was not at all dependent on the success of those services. In rendering those services, they did not render them directly to the ship, but they rendered them incidentally in the discharge of, and as a part of, their duty to their employers. When they were hired, they were given to understand by the corporation, that they should receive only their wages, and that they should have no share otherwise in any earnings of the vessels or of the corporation; and none of them will have any share in anything that may be awarded to the libellants in this case. The masters and crews of the steamers must, therefore, be wholly left out of the case. The corporation cannot claim as assignee in advance of what might otherwise be the claims of its hired servants for salvage; and those servants, having cut themselves off, by their contract with the corporation, from setting up any claim for salvage in this case, such claim never had any existence, so as to be capable of assignment after the fact.

Nor can the corporation itself be a salvor. It cannot hire persons on wages, and claim salvage for services rendered by those persons. If such a principle were to be admitted, it would have to be extended to individuals; and yet it was never heard, that one person could hire another on wages to perform a salvage service to a vessel in distress and to have no share otherwise in the compensation therefor, and that, after such service had been rendered by the latter, the former, who had taken no personal part in it, could claim salvage compensation therefor, as such. Yet that is precisely the claim which the libellant corporation in this case is urging, when it asks to be paid as if it had been an individual salvor. The main element which the law recognizes and requires as an element in a salvage service, is wholly wanting in the case of a corporation. That element is, the impulse and stimulus which spurs the individual salvor to manifest boldness and heroism and incur risk and peril, by the expectation of the large compensation which the law awards in case of success. That element was wholly wanting in this case. The ship and her cargo, as a consideration for their liability to pay a salvage compensation, were entitled to the exercise of all the energies which individual salvors could put forth, impelled by all the hopes of salvage reward which could operate to stimulate those energies. There were no such hopes of salvage reward in this case, on the part of the officers and crew of the steamers; and it is at least doubtful—in view of the fact that the Yankee failed, through timidity, to reach the ship, until on the third attempt to do so, while a pilot boat and her yawl boat seemed to have no difficulty in navigating safely in a no less boisterous sea—whether the same energies were put forth by those on board of the Yankee to reach the ship promptly that would have been manifested if they had been working for themselves and not merely for their employers. The master of the Yankee says that he turned back, on his first attempt to reach the ship, because he considered the risk too great, and that he abandoned the second attempt because he would not run the risk until daylight. It is very questionable whether wrecking corporations for salvage business, with their employees placed on the footing occupied by those of this corporation, are, on the whole, of advantage to commerce. There is, on the one hand, the benefit of associated capital of large amount, with well fitted appliances for the business. But this has the effect to drive individual salvors out of the business, and the daring and courage and insensibility to danger, nerved by the prospect of large reward, which are manifested constantly by individual salvors, are replaced by the poor substitute of hired labor, which has nothing to gain by taking risks, and is, therefore, likely to fail to use promptly, at critical moments, the ample means placed at its disposal.

The corporation is entitled to a proper compensation for the use of its two steamers, and of such of the appliances on board of them as were used in the service rendered to this ship. The case must be viewed as one of contract, for work and labor, without reference to the value of the ship and her cargo, as an element in the measure of compensation. Marshall, the master of the Yankee, placed it in that position, by what passed between him and the master of the ship. It is manifest, that the latter, by regarding $1.000 as a large charge, and offering $500, had no idea that he was subjecting his vessel and cargo to a salvage charge. It is entirely clear, on the evidence, that if he had been told that, if he allowed himself to be towed off from where he was, by the Yankee, he would, in the end, be obliged to pay her owners a compensation of $25.000 for the service, he would have assumed the risk of remaining there, the wind having already

changed to a favorable quarter, until a vessel, more moderate in her demands, should come to his aid. The master of the ship says, that he heard no mention of any price by Marshall, except $1,000, and that he heard nothing about £2,000, or about any pounds.

The hazard to the steamers and the property on board of them, whatever it was, is to be taken into view, as making the service worth more than if there had been no hazard to them. But the idea that a proportion of the cost of maintaining the steamers and property for occasional service, and of the current expenses of the corporation, while such steamers and property are not employed in the service of this ship, is to be paid by this ship, is wholly inadmissible. In this case, the corporation would have had a claim for compensation for the time and services of the steamers in endeavoring to pull the vessel off, even if they had failed. Their compensation must, of course, be greater because of their success.

I wholly reject the testimony of the so-called expert witnesses on both sides, who give evidence as to their opinion of the value in money of the services rendered. They proceed on grounds which are unsound, and not in consonance with the views which, as above stated, must govern this case.

On the whole evidence, I think $1,500 is ample compensation in this case, and, as the claimants, before suit was brought, offered to pay $2,000 by way of compromise, I allow no costs to the libellants.

[On appeal to the circuit court, the above decree was affirmed. Case No. 13,530.]