## Case No. 1,432.

### The BIRDIE.

### [7 Blatchf. 238.][1]

### Circuit Court, S. D. New York. May 9, 1870.[2]

#### SALVAGE—CORPORATION—COMPENSATION.

1. Services rendered by a steam tug, owned by a corporation engaged in the wrecking business, in rescuing a vessel in distress, *held* to be a salvage service in respect to the interest of the corporation, and salvage compensation awarded to the corporation, in that respect, in a suit brought by it alone against the vessel, in admiralty.

[Cited in The Plymouth Rock, 9 Fed. 417.]

2. The district court having awarded $240, this court awarded $1,200.

3. While a share in the property saved is awarded in a case of this kind, being a compensation larger than for mere labor and service, the amount awarded is to be adjusted in conformity rather with the claims of an owner of property put at risk, than with the claims of salvors claiming for the exhibition of personal courage and heroism.

[Approved in Ehrman v. The Swiftsure, 4 Fed. 467. See, also, Union Tow-boat Co. v. The Delphos, Case No. 14,400; The J. F. Farlan, Id. 7,313; The Stratton Audley, Id. 13,529; The Camanche, 8 Wall. (75 U. S.) 448; The Egypt, 17 Fed. 359; The Sterling, 20 Fed. 751.]

[4. Cited in The Sandringham, 10 Fed. 575, to the point that a narrow escape from a subsequent storm by means of the forecast, skill, and expertness of salvors, is to be considered in salvage cases.]

[Appeal from the district court of the United States for the southern district of New York.

[In admiralty. Libels, one by the Coast Wrecking Company, and the other by John Clough and others, owners of the steam tug William Fletcher, against the brig Birdie and her cargo. Decree for libellants in the district court. Modified.]

Clifford A. Hand, for libellants.

Gilbert M. Speir, for claimant.

WOODRUFF, Circuit Judge. I presume the amount awarded by the district court to the libellants in this case for the services of their steam tug Relief, in getting off the brig when grounded on the shore off Long Island, and bringing her to New York, was largely influenced by the decisions of the circuit and district courts for this district in the case of The Morning Star, [Case No. 9,818,] in which Judge Betts held that salvage ought not to be awarded to a corporation. The decree in that case, allowing what was deemed a reasonable compensation for the time and labor and use of the libellants' vessel, was affirmed in this court, Mr. Justice Nelson ex-. pressing an inclination, at least, to concur in the opinion of the district judge. If the authority of that case were now unaffected by other decisions, I should be disposed to defer thereto, notwithstanding my own opinion

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]
[2] [Modifying Case No. 1,431.]

that it ought not to prevail. It is clear, and was so before that decision, that, where salvage service was effectually rendered by a vessel to another vessel in distress, it was not the services of the master and crew alone of the saving vessel that were considered in determining the amount of salvage, or in making distribution thereof. The danger encountered by the saving vessel herself, her detention or deviation to render aid, the risk she encountered, and her important contribution in making the personal service and danger incurred by her master and crew effective, were and are properly to be taken into account, and an allowance therefor made to her owners. If this be so, then the circumstance that her owner is a corporation appears to me to be wholly immaterial.

But the question seems to be put at rest by the decision of the supreme court in the case of The Camanche, 8 Wall. [75 U. S.] 448, in which the decree of the circuit court of the United States for the district of California, awarding compensation as salvage, was affirmed. In delivering the opinion of the court, Mr. Justice Clifford discusses the question at great length, and shows that neither reason nor authority requires that, for salvage service, corporations should be denied salvage compensation. Authorities in England and in this country are largely collected, and the affirmance of the decree is stated, without an intimation that any member of the supreme court dissented.

The only questions, therefore, which I regard as open, are, whether the circumstances in which the service was rendered in this case entitled the rescuers of the brig to salvage, and whether a reasonable amount was awarded.

Upon the first question there is no room for hesitation. The brig had been carried ashore by ice, and lay helpless, exposed to a heavy wind, at a time when, by the intensity of the cold, her crew had been compelled to leave her and go ashore to save their own lives. Her master had gone to the city for assistance. Although there was at the time no violent storm, she was not protected from the consequences of a gale, which was liable to occur at that season of the year—early in March—and, though not in immediate peril of destruction, her need of very early assistance was most obvious. The libellants having. through their own peculiar facilities and arrangements, obtained very early information that a vessel was ashore, despatched their superintendent in a steam tug, hired by his direction, and he reached the brig before her crew had left, and made an effort to haul her off, but found that tug inadequate, whereupon he went fifteen miles, to the place where their own powerful tug was lying, took her to the brig. arriving at about eight or nine o'clock at night, found that the crew had then left, and, by the combined power of the two tugs, the brig was drawn off shore and brought to Jersey City in safe-

ty and uninjured. No great difficulty and no great danger to life or property were encountered, though the witnesses state that, on the return, much ice impeded their progress, and it was necessary that the libellants' powerful tug should lead the way, breaking the ice in her path, at some risk of injury to herself. The value of the libellants' tug, with her equipment, is stated to be $80,000. The value of the brig and cargo saved was admitted to be $19,000. The district court allowed the hire of the steamboat employed by the libellants, namely, $12 per hour, for the 24 hours she was engaged, ($288,) and allowed to the libellants $15 per hour for 16 hours, the period of the actual service of their tug, the Relief, ($240,) in all amounting to $528 to the two. I cannot doubt that these amounts were fixed as mere compensation for an ordinary service, since, as to the one boat, the allowance was at the precise sum at which she was hired by the libellants, and, as to the other, it was proved that, for ordinary wrecking, they would let their boat to a third party for a fixed compensation of $15 per hour.

Although the amount to be allowed as salvage depends upon many circumstances, it is not to be reduced to actual cost, or to the just sum at which the owners would permit their boat to be used, even in the same service, where they have a guaranty that so much at least will be certainly paid. Here, the libellants not only took the risk of injury to their boat, but encountered the service in a day and a night of extreme cold, and at the hazard of receiving neither reimbursement of expense, nor compensation for service or injury, if unsuccessful, or if any other vessel was earlier on the spot, prepared to render the needed assistance.

The conduct of the libellants in concealing the fact that they had received intelligence that a vessel was ashore on Long Island, was insisted upon as reprehensible, and as a reason for withholding a more liberal compensation. It is quite true that the agent of the libellants did not disclose the fact, and that his motive was to secure to the libellants the first chance of rendering aid, and so of securing compensation, and that, on his passage to the brig, he expressed his eagerness to get there before a rival company should do so. There was, at that time, in this city, another wrecking company, and he unquestionably acted under some apprehension that, if he published the intelligence, that company might endeavor to reach the place before him. The lives of persons on board of a wreck, and the property which is in danger of destruction, are not to be trifled with, and the peril needlessly protracted, for the private gain of others desiring to profit even by efforts for their deliverance; and yet it is going far to say, that persons who, in their desire to render the earliest possible assistance to vessels which may come to peril along the coast, establish lines of communication and create facilities for gaining the earliest possible intelligence, and are ready and willing instantly to act thereon in giving the necessary aid, are bound to publish that intelligence, when received, in order to enable a less active and less efficient rival in the business to avail himself of their superior means of knowledge, and, perchance, to deprive them of the fruits of their activity and vigilance. Competition in the very matter of obtaining such information from points along the coast, is of great value to the commercial community, as well as to the persons whose lives may be in danger, and we should be careful lest, by pronouncing such information common property, and by requiring its instant publication, we should take away the motive to its acquisition, and, as a result, by the discontinuance of such special means of early knowledge, protract the peril to life and property when in danger. In the present case, the other wrecking company had no steam tug in port, and the activity of the libellants did, in fact, bring deliverance to the brig sooner than, without their instrumentality, it could have been rendered.

I think the libellants entitled to a larger compensation. But their service was attended with little actual danger, and their hazard was chiefly the risk that their assistance might be declined, or that some other casual steam tug would first reach the brig and relieve her. On that ground, the compensation, although awarded as salvage, should be moderate, and yet sufficient to encourage the business to which the libellants have devoted their capital, and in which they are shown to have employed facilities and skill of great value for emergencies to which all vessels on the coast are at times exposed.

It is not unimportant to add, that, in fixing this reasonable allowance, it is proper, also, to recur to the ground and foundation upon which the allowance of extraordinary compensation has always been made to salvors, and the chief motive to that allowance, namely, the personal risk and hazard of life, volunteered for the relief of the distressed and the preservation of property in peril, and the policy of encouraging parties to incur such hazard, to the end that relief may be prompt and efficient. Assisted by all the aids and appliances which capital and skill can supply, there is still room for the exhibition of personal courage and daring, which, in the distribution of salvage money, are largely considered and liberally compensated; and, therefore, although the owners of property employed and put at hazard in the service are permitted to be sharers in the salvage, and are esteemed meritorious contributors to the saving, they lack this prime element in the motive to the allowance—the heroism, courage, and daring which are promoted by allowances to the living actors, in the endeavor to save life and property. Nothing in the decision of the supreme court, in the case before referred to, forbids the proper recogni-

tion of this distinction. The libellants, so far as is disclosed by the evidence, have hazarded property, and property only. Their great efficiency and usefulness are to be recognized and encouraged, but their share in the property saved is to be measured by a just estimate of the nature of their risk, and not necessarily by the standard which might govern an award to individuals who had voluntarily encountered the greater hazard of their own lives in the service. While, therefore, a compensation larger than is ordinarily due for labor and service is to be made, and they are to be adjudged to share in the property saved, the amount is to be adjusted in conformity rather with the claims of an owner of property put at risk, than with the claims of salvors whose personal courage and heroism are entitled to larger consideration.

In my judgment, twelve hundred dollars is a suitable sum. Let the decree be modified so as to award to the libellants that amount.