## THE PLYMOUTH ROCK.

(*District Court, S. D. New York.* 1881.)

1 SALVAGE—PASSENGER STEAMER.

Towage rendered to a vessel that is disabled, and in a situation to occasion reasonable apprehension of danger, is salvage service. Hence, where the Plymouth Rock, a passenger steamer of light draught and excessive "free board" exposure to the wind, in grade belonging to the class of river and sound steamers, and rated as A 2½, became completely helpless as to motive power by the breaking of her steam-pipe within a short distance of the New Jersey coast, in a north-east gale and a heavy sea, and with only two-thirds of the usual equipment in anchors and chains of full sea-going vessels, *held*, that the service performed in towing her into the port of New York is a salvage service.

2. SAME—COMPENSATION.

In the language of the court, the most important considerations in fixing such awards are the value of the property rescued, the number of lives imperilled, the degree and imminence of the danger, the proximity of other means of succor, the hazard, labor, and skill of the salvors, the duration and difficulty of the service rendered, the value of the vessel employed, and her danger in rendering it, and the incidental risks or responsibilities incurred by the latter or her owners, if any, through any deviation from her voyage in rendering the service.

In this case $2,000 was adjudged to be a just award, in view of all the circumstances.

In Admiralty.

*Butler, Stillman & Hubbard,* for libellants.

*Sidney Chubb* and *Wm. W. Goodrich,* for claimant.

BROWN, D. J. The libel in this case is filed by the owner, together with the master and crew, of the steam-tug Germania, consisting of seven persons, to recover the sum of $10,000 for salvage services rendered to the Plymouth Rock, August 17, 1881. The answer admits that towage service was rendered, and tenders $300, which it alleges is a reasonable compensation therefor, and denies that the libellants are entitled to any compensation as salvage.

The Plymouth Rock is a side-wheel passenger steamer, originally constructed for navigation upon Long Island sound. Her length is 325 feet, beam 28 feet, tonnage 1,812 tons,—half above and half below,—her main deck depth of hold 12 feet, and draught loaded about 9 feet; her boilers are set upon guards, on a line with the main deck; above this is the promenade deck, and a hurricane deck above. Some years ago she was withdrawn from the sound, and used as an excursion steamer. In grade she belongs to the fifth class of steamers, —*i. e.,* river and sound steamers,—and in that class ranks as A 2½, "very low as a sound steamer;" not being fitted, either in structure or equipment, for general ocean navigation, nor for the coasting service. She has been consid-

ered suitable, however, for short excursions on the ocean, except in rough and tempestuous weather. She had no sails. The area of her upper works presented to the wind, technically called her "free-board," was essentially large as a sea-going vessel for her draught and tonnage, and her anchors were one of 1,699 pounds, (without the stock,) and the other of 1,994 pounds, provided with 60 and 75 fathoms of chain. The rule for sea-going vessels, of the same tonnage, would require one anchor of 2,800 pounds, and one of 3,200 pounds.

During the summers of 1880 and 1881 she was employed in making daily trips from New York to Long Branch, going outside of Sandy Hook and thence along the New Jersey coast about 13 miles, and landing her passengers at the iron pier built out from the beach some 900 feet. She has carried as many as 3,000 passengers, and sometimes, from the roughness of the sea, she has been obliged to return without landing. On the seventeenth of August, 1881, she left her dock at Twenty-third street upon one of her usual trips at a little after 9 o'clock in the morning, with about 500 to 600 passengers on board, besides some 75 others,—musicians, servants, seamen, etc. On passing the Narrows the weather and sea were found to be rough, and the wind was blowing a moderate gale from the north-east and the tide flood. She proceeded, however, upon her course, and when about a mile beyond the end of the Hook, at about half past 11 A. M., the steam-pipe was suddenly broken, letting all the steam from her boilers escape, and she thereby became completely disabled and helpless in her motive power. The steam passed mostly out midships, through the opening for the piston and walking-beam; but a considerable amount penetrated the main deck and into the saloon above, creating for a time a panic among the passengers and musicians. I do not find from the evidence that the officers or crew shared in the general confusion or alarm, or failed in their appropriate duties.

The evidence is very conflicting in regard to the distance of the Plymouth Rock from the beach at the time of the accident. I shall adopt the position assigned her upon the chart by Capt Ladd, the pilot in charge, which indicates about three-eighths of a mile, or about 2,000 feet from the shore. This position was near her usual track, in the deep water of the False Hook channel, where her progress would be easiest. In the rough weather of that day it is altogether improbable that she would go much further eastward, so as to be not only out of her usual course but in the shallow waters over the False Hook, where she would labor more and her progress be less easy. At 10 o'clock that morning the wind had been blowing a moderate gale of 32 miles per hour from the north-east directly on shore, according to the record kept at Sandy Hook; at 11:15 it blew 22 miles, and at 3 P. M. it was but 13 miles per hour. Just before the accident, one schooner was observed going to sea without reef in her sails, but in general most other vessels—pilot-boats and others—had hauled under the Hook for shelter. The steamer Plymouth Rock met some of them coming in,—the tug J. B. Schuyler, the Blackbird with a fishing party,—a pilot-boat, under double-reefed sails, going inside, under the lee of the Hook. The sea was recorded as "heavy," the testimony fully sustaining the record; and the tide was a strong flood, setting partly

on shore. In a few moments after the accident, as soon as her headway was lost, the Plymouth Rock settled into the trough of the sea, broadside to the wind, and in that position, with the great area of her upper works, and the consequent great expanse to the force of the wind, it is manifest, under the combined effect of a strong wind and tide and a heavy sea, she must have speedily gone ashore; and this, as soon as the escaping steam had disappeared, was the fear of her passengers. Her sole dependence was upon her anchors.

At the time of the accident the Germania, a staunch and powerful sea-going steam-tug, 100 feet in length, with engines of 125 horse-power, was cruising at sea in search of vessels needing assistance, and was then from one to two miles to the south-east of the Plymouth Rock. Those on board of her saw the escaping steam and also observed what appeared to be blasts of her whistles, then too far to windward to hear them. These were interpreted as signals of distress, and the libel charges that such signals were given. The answer, however, denies this, and the proof established that no such blasts of the whistle, nor any other signals of distress as of desired aid, were given from the Plymouth Rock. Her engineer, driven from the engine-room, had ordered an assistant to go upon the hurricane deck and open the two safety-valves to facilitate the escape of steam. This was done, and the dense jets of steam from the safety-valves, lasting for a few moments, are what those on board of the Germania misunderstood as signals for help. The Blackbird, which at the time was just going in round Sandy Hook and saw the escaping steam, did not surmise that the Plymouth Rock was in trouble and proceeded on her way. The Germania, immediately upon these supposed signals, went to the assistance of the Plymouth Rock, and reached her in about 10 minutes after the accident. The captain of the latter, seeing the Germania approaching, countermanded the orders which the pilot had previously given, to cast the port or smaller anchor, which had already been unlashed by the first officer, and was previously shackled to the chain, with some 15 fathoms overhauled.

The Germania was up athwart the bows of the Plymouth Rock. The pilot of the latter asked to be towed in, and inquired the price. The captain of the Germania answered that it was no time to make any bargain; that they would take hold and leave it to be settled how much it was worth. From each vessel a line was then hove to the other, having a hawser attached; that from the Germania missed. The line from the Plymouth Rock, with her hawser of 50 fathoms' length attached, was drawn upon the Germania, and the hawser made fast, and the head of the Plymouth Rock was then pulled round to windward. This occupied from 10 to 15 minutes from the time the Germania came along-side. An additional hawser of the Germania was shortly after attached, and the Plymouth Rock was then towed to her dock at Twenty-third street, New York, without further difficulty then, at about 4 o'clock P. M. After passing the Hook, the City of Richmond got a hawser ahead the Plymouth Rock with considerable trouble and delay, owing to the roughness of the sea, and assisted in the subsequent towage. This assistance was not entitled to and does not diminish the claims of the Germania for her services. No damage after the accident was done to either vessel, and no person on board of either vessel sustained any loss or injury.

Upon these facts I am of opinion that the Germania is clearly enti-
tled to charge compensation, according to both early and late decis-
ions. *The Raikes,* 1 Hagg. 246; *The Charlotte,* 3 W. Rob. 68, 71; *The
Saragossa,* 1 Ben. 551; *The Leipsic,* 5 Fed. Rep. 108, 113; *Brooks* v.
*The Adirondack,* 2 Fed. Rep. 387, 872; *Atlas Steam-ship Co.* v. *The
Colon,* 4 Fed. Rep. 469; *McConnochie* v. *Kerr,* 9 Fed. Rep. 50.
If not salvage it is "mere towage." In the definition of tow-
age given by Dr. Lushington in the case of *The Princess Alice,* 3 W.
Rob. 138, so often cited, he says: "Without attempting any definition
which may be universally applied, a towage service may be described
as the employment of one vessel to expedite the voyage of another
when nothing more is required than the accelerating her progress;"
and in the case of *The Reward,* 1 W. Rob. 174, he says mere towage
service is confined to vessels that have received no injury or damage;
where the vessel receiving the service is in the same condition she
would ordinarily be in without having incurred any damage or acci-
dent. These rules have been adopted and applied by this court in
the case of *The Saragossa,* 1 Ben. 551, and in many other cases.

In the case of *Hennessy* v. *The Versailles,* 1 Curtis, 356, the court,
*Curtis,* J., says:

" I do not think there is such a thing as towage service known as such to
the marine law, as contradistinguished from a salvage service. Towage, like
pumping or steering, making sail, or any other ship work, may occur in the
ordinary course of navigation, or may be a means of salvage; and whether
it is to be paid for according to a *quantum meruit,* or at an agreed price, or
by wages, or by a salvage compensation, must depend upon the circumstances
under which it is performed. In this case the Versailles being in distress,
and in a condition to have a salvage service rendered to her, and having been
relieved by towage, that towage was in its nature and circumstances a sal-
vage service."

Now, it is not necessary to constitute a salvage service that the
danger be immediate or absolute; it is sufficient that at the time the
assistance is rendered the ship has encountered any danger or mis-
fortune which might possibly expose her to destruction if the service
were not rendered. *The Charlotte,* 3 W. Rob. 68-71; *The Saragossa,*
1 Ben. 551. A situation of actual apprehension, though not of ac-
tual danger, is sufficient. *The Raikes,* 1 Hagg. 247; *The Sloop Joseph
C. Griggs,* 1 Ben. 81; *The Bella Constance,* 33 Law J. (N. S.) 191.
When towage, therefore, is rendered to a disabled vessel, not with a
view merely to expedite her passage from one place of safety to an-
other, but with the obvious purpose of relief from some circumstances

of danger, either present or reasonably to be apprehended, compensation upon salvage principles is to be allowed. Even cases of corporation salvors, cited by the claimant's counsel, at one time held not to be within this rule, (*The Stratton Audley*, 3 Ben. 241; *The J. F. Farlan*, Id. 207,) are no longer an exception. *The Camanche*, 8 Wall. 448; *The Birdie*, 7 Blatchf. 238. The degree of danger is of no importance as regards the application of the principle itself, (*The Westminster*, 1 W. Rob. 232,) although it is of the utmost importance in fixing the amount of compensation under it.

To say that the Plymouth Rock, upon becoming completely disabled by the loss of her steam-power within a quarter of a mile of the shore, as I hold she was when the Germania reached her, with her light draught and excessive "free-board" exposure to the wind, in a north-east gale and a heavy sea, on the New Jersey coast, and with only two-thirds of the ordinary equipment in anchors and chains of full sea-going vessels, was in a situation to afford a reasonable apprehension of danger, would, I think, be stating the case very mildly, and it is too obvious to require further comment. I find much more difficulty in determining the proper amount of salvage compensation to be awarded. The most important considerations in fixing such awards are the value of the property rescued, the number of lives imperilled, the degree and imminence of the danger, the proximity of other means of succor, the hazard, labor and skill of the salvors, the duration and difficulty of the service rendered, the value of the vessel employed, and her danger in rendering it, and the incidental risks or responsibilities incurred by the latter or her owners, if any, through any deviation from her own voyage in rendering the service, as usually happens in salvage cases at a distance from port.

The value of the Plymouth Rock is not shown by any competent proof to have been greater than the sum of $60,000 admitted by the owner. The fact that she was put for the whole issue of the capital stock of $100,000 in the formation of the Plymouth Rock Company, from which company the claimant bought her, though evidence of value, possibly, as against that company, cannot be binding upon the claimant here. The value of the Germania was about $21,500. She was employed upon this service about five hours, which, considering her previous going out to sea, is equivalent to one day's service. She was doubtless subjected to some increase of peril, in case of accident or unskilful handling, in approaching the Plymouth Rock upon a lee

shore in a heavy wind and sea; but, aside from this, she incurred no additional burdens or responsibilities. She was prosecuting on her own part the business for which she was in part designed, and was in the ordinary pursuit of her employment, and she suffered no loss or injury in rendering the service; and neither the difficulty nor the personal labors or hazard of the salvors themselves greatly, if at all, exceeded those in cases of ordinary towage in rough weather; and other tugs were either near at hand or within a few hours' call. Many of the important circumstances, therefore, which often go to increase the amount of salvage compensation are either wholly wanting in this case or exist in only a comparatively small degree.

On the other hand, the large number of passengers whose lives were involved in the safety of the vessel is in this case an important consideration, although by the general maritime law, aside from statute, the saving of human life, disassociated from the saving of property, is not a subject of salvage compensation, but left to the bounty of individuals; yet when connected with the rescue of property it is uniformly held to enhance the meritorious character of the service and the consequent remuneration. *The Aid,* 1 Hagg. 84; *The Queen Mab,* 3 Hagg. 242; *The Emblem,* Davis, Rep. 61; *The Fusileer,* 3 Moore, P. C. 51; Marvin on Salvage, § 121. Life salvage is now expressly provided for by the British Merchants' Shipping Act of 1854, §§ 458, 459; but we have no similar statute in this country. The weight to be given, however, to this consideration, as in considering the risk to the vessel herself, depended largely upon the degree and imminence of the danger, the probability of disaster if unrelieved, and the opportunities for other means of rescue. That the situation of the Plymouth Rock, when disabled by this accident, was in general one in which danger was reasonably and justly to be apprehended, is sufficiently manifest. But in attempting to go beyond that and to determine the precise degree of her danger; whether she would have gone ashore if unrelieved; whether her anchors and chains were insufficient and would have dragged, or how much or how rapidly; or whether, in the wind and sea then raging, her structure was such as to ensure her riding at anchor safely without further accident or injury,—much is left to conjecture and uncertainty amid the contradictory opinions of the witnesses. It was not, however, denied that she was not built for a sea-going steamer, nor that her rank for a sound steamer was very low. If, therefore, the conditions of wind and sea were of any great degree of violence

the presumptions were all against her upon so dangerous a coast. Upon this point also the witnesses greatly differed. Several witnesses on the part of the libellants, accustomed to going outside in all weathers, testified that the sea was about as "nasty" as they were ever out in. A pilot, who had come past the Long Branch pier that morning, said the waves were dashing over the end of it, and that the Plymouth Rock could not have landed her passengers; while the captain and others on the Plymouth Rock testified that they had been down to the pier and landed passengers in rougher weather. Most vessels were, it is true, returning inside for shelter; but a schooner was seen going out without reef in either foresail or mainsail. In the record kept at Sandy Hook the sea was set down as "heavy;" the wind was north-east; 32 miles per hour at 10 A. M., 22 at 11.15, and 13 miles per hour at 3 P. M. While the sea, therefore, was bad, the wind was abating, and the conditions in these respects were far from being the worst which sea-going vessels are called upon to encounter.

Much testimony was given concerning the sufficiency of the chains and anchors. The weight of the two anchors were at length fixed at 1,699 and 1,994 pounds. The tonnage of the Plymouth Rock would require for sea-going vessels 2,800 and 3,200 pounds, according to the testimony of Mr. Hazard, an acknowledged and competent expert. He testified that each anchor should have 90 fathoms of chain. The Plymouth Rock had 60 and 75 fathoms. While her equipment in these respects was one-third less than required for sea-going vessels, her "free-board" exposure to the wind was greatly in excess of sea-going vessels of the same tonnage; and her draught or hold upon the water much less, which would expose her to special peril in a high wind and sea; and on these grounds many of the libellants' witnesses expressed the opinion that she would have drifted ashore with both anchors out, while the claimant's witnesses thought she would hold with one anchor alone, with 25 or 30 fathoms of chain. The bottom was sandy, affording, though not the best, yet fair anchorage. Neither the sufficiency of her anchors nor her behavior at anchor, under any conditions analogous to the present, appear ever to have been actually put to the test. Capt. Curtis had been in charge of her from time to time for nearly 20 years, and had she ever been in the like situation before and behaved creditably, it would doubtless have appeared on the trial. The instances cited of her anchoring off Cape May in a rough sea but nearly calm wind are not pertinent. From the absence of proof of the Plymouth Rock

or any similar boat being in any analogous situation in the open sea, it may, perhaps, be inferred that vessels of this class have been unusually carefully kept out of the reach of such casualties. The nearest analogy to the situation of the Plymouth Rock proved at the trial was the case of the Narragansett, a steamer of about the same tonnage and value and free-board exposure, but whose boilers were in her hold, which anchored in the sound in a snow storm near the shore opposite the Connecticut river, in a similar wind, but I judge a much less heavy sea, in 14 feet of water, with one anchor of 2,080 pounds and 45 fathoms of chain.

While the testimony on these points does not lead to any certain result, the explanation of the accident itself, as given by the engineer of the Plymouth Rock, illustrates conclusively her unfitness in structure for the situation she was in. In his opinion the accident was caused by the sea rolling under her as she listed to starboard, and lifting her guards and the boiler resting upon them, and thus causing the fracture of the rigid steam-pipe connecting the boiler with the engine. Still further lifting of her guard might cause her to fill and sink. This was the danger Mr. Haswell had already pointed out. The claimant's witnesses had put her guard amidships at nine feet above water; but, as her hold was but twelve feet deep, this would leave but three feet of her hold below water, while her draught was nine feet. On the argument it was conceded, therefore, that the height of the guard had been given incorrectly. It should probably be reduced one-half. Mr. Haswell considered that her "situation," assuming that the sea was sufficient for her to take water under her guard, was perilous, if obliged to remain there for some time, not for a few minutes or half an hour, and he considered her anchors and chains insufficient.

I am satisfied that the witnesses from the Germania have greatly exaggerated the nearness of the Plymouth Rock to the shore. Several of them stated that she was not more than twice her length from the breakers when they reached her, and within one length when they got her headed off. The shore is there rather bold, and the breakers, according to Capt. Curtis, are only some 50 feet from the beach. But if, as appears from their testimony, the Plymouth Rock drifted but once her length during the 10 or 15 minutes which the Germania occupied in getting hold and heading her off, she would have drifted no more during the same time previous, which, according to the testimony, it took for the Germania to reach her after the accident.

And as she was at that time, as I have found above, about 2,000 feet from the beach, she must have been more than a quarter of a mile from the beach when the Germania reached her.

It is equally clear, I think, that the master and officers of the Plymouth Rock had no apprehension of any immediate danger. There is no evidence of any want of coolness, or of any confusion or alarm on their part. No whistles were sounded, no signals for relief exhibited, as would have been done had any immediate disaster been feared. The port anchor was unlashed and ready, with 15 fathoms of chain overhauled, to be cast at once. The starboard anchor, with 25 fathoms of chain overhauled, could have been also cast in some 15 or 20 minutes, and from 60 to 75 fathoms of chain to each could have been let go if required. The pilot's order to throw the port anchor was countermanded by the captain because he saw the Germania approaching. This is no evidence of the officers' distrust of the anchor, or of their fear of the vessel's inability to ride at anchor for a considerable period without further accident,—long enough, at least, to procure help from other vessels, some of which were near at hand, while others, if needed, could have been procured from New York within a few hours. The sea was doubtless as heavy as it had been, but the force of the wind had already greatly abated, and continued to decrease rapidly, until at 3 P. M. it was but a moderate breeze. Considering this great decrease in the strength of the wind it is most probable that the Plymouth Rock, had no further accident occurred to her, might have maintained her anchorage without going ashore for a considerable time,—long enough to obtain any other help she might have desired.

In my judgment, therefore, the Germania cannot, upon the evidence, maintain her claim to the high merit of having saved the Plymouth Rock and her many valuable lives from disaster, which, if justified by the proofs, would have entitled her to large compensation. But the circumstances at the time of the accident were none the less such as to justify great apprehension. That the gale would continue to abate could not then be known; had it increased, the situation of the Plymouth Rock might have become critical. The business of the Plymouth Rock was with passengers exclusively. Her first duty, when disabled and in peril, was to provide for their deliverance as speedily as possible, not only from actual danger, but also from the terror and suffering of long exposure to the apprehension of shipwreck. To the enterprise of the Germania, cruising in tempestuous

weather to aid those who might be in distress, while other vessels were seeking shelter, it is due that almost instant relief was provided for the Plymouth Rock and her terror-stricken passengers.

It has often been held that the interest of commerce and humanity require that the maintenance of large and powerful steamers, to assist in saving property in peril at sea, ought to be encouraged by liberal compensation when their services are needed. In few cases are these services more needed or more timely than when excursion steamers, not adapted for services at sea, are sent loaded with passengers out upon the open ocean, and are there caught, through accident, in those very circumstances of peril which they have neither the build nor the equipment (with the ordinary guaranties of safety which sea-going vessels are required to possess) to meet. The service of the Germania is, therefore, a meritorious one, and deserves substantial reward, but not one out of proportion to the actual emergencies of the situation; and the fact that it was performed with celerity adds to, rather than diminishes, the merit of her claim. *The Constance*, 33 Law J. (N. S.) 191.

In cases like the present, however, where no signals for relief have been given, and where the urgency for immediate assistance is not shown to be certain, and evidently was not believed to be great by an experienced and competent master in command, no such large compensation ought to be made as shall operate to deter masters from promptly availing themselves of offered assistance, or lead them to prolong risks to life or property rather than incur large salvage awards. *Ehrman* v. *Swiftsure*, 4 FED. REP. 463.

In view of all the circumstances, I think $2,000 will be a just award, —two-thirds to go to the owner of the Germania; of the remainder, $100 to be paid to the captain, and the rest apportioned among the captain and crew according to their wages. Let a decree be entered accordingly, with costs to the libellants.