## THE CAIRNSMORE.

*(District Court, D. Oregon.* June 14, 1884.)

1. DERELICT—RIGHT OF FIRST SALVORS.
The bark Cairnsmore went ashore on Clatsop beach in a thick fog, and the master and crew took to the boats and left her, without, so far as appeared, an intention to return or hope of recovering her, but sold her as she lay, within two days, for the benefit of whom it might concern; but in the mean time she was taken possession of by the libelants, who proceeded at once to save her tackle, apparel, furniture, stores, and cargo. *Held,* that the vessel was derelict, and that the salvors who first got possession of her were entitled, for that purpose, to maintain the same, even against the owners or their vendees, so far and so long as they were reasonably able and had the means to save her or any part of her; but when it was manifest that they were unable to do so in any particular, as well and surely as others who might offer to assist in the enterprise, it was their duty so far to yield the possession to such others.

2. SALVAGE SERVICE—COMPENSATION OF.
Where there is neither risk of life nor property involved in a salvage service, nor any special knowledge or ingenuity required or used therein, the principal elements in the compensation of the salvor are the value of the labor and care bestowed upon the saved property, and the degree of integrity and responsibility involved in keeping it safely and duly accounting for it, together with the risk of success.

Suit for Salvage.

*C. W. Fulton* and *Frederick R. Strong,* for libelants.

*Charles B. Bellinger* and *Rufus Mallory,* for claimants.

DEADY, J. The libelants, J. E. Thomas, Thomas Doig, F. H. Ward, John Brown, James Lidwell, Duncan W. McKenzie, W. G. Ross, A. McKenzie, John Wilson, C. A. McGuire, William Stodard, and Martin Foard, bring this suit for salvage against the tackle, apparel, and certain of the furniture, stores, and cargo of the bark Cairnsmore, lately stranded on Clatsop beach, a short distance below Point Adams light. The libel contains a list of the articles saved from the bark, which includes her sails, rigging, hawser, anchor, and mooring chains, chronometer, compasses, boats, anchors, and 29 barrels of cement, alleged to be of the value of $8,000. The claimants, J. A. Brown and W. T. McCabe, answering the libel, admit the salvage service, but allege that soon after the stranding of the vessel, and before the saving of the articles in question, except the sails, they purchased the Cairnsmore and cargo from the master for the sum of $450, and demanded the possession of the same from the libelants, which was refused; whereby they lost the opportunity of saving both the vessel and cargo, which they were prepared to undertake with a reasonable prospect of success.

From the evidence it appears that the Cairnsmore was an iron vessel bound from England to Portland, with a cargo of cement of about 1,400 tons. On Thursday, September 27th, she went ashore on Clatsop beach, in a thick fog, with a light wind, a mile or two below Point Adams light. On the next day the master and crew left her in the ship's boat, and within a few hours were picked up by the steam-ship Queen of the Pacific, near the mouth of the Columbia river, and carried to Astoria. On Friday evening, McCabe, Duncan W. McKenzie, and several others of the libelants, having heard of the stranding, gathered in the vicinity of the wreck, and the next morning McCabe and McKenzie, by means of a small skiff, which the latter had procured, boarded the vessel, and took possession of her, and, with the aid of the rest of the libelants, commenced to wreck her. They first took off the sails, which were still set, and sent them ashore on a line from the foretop to the beach, and then commenced to remove the rigging. During the forenoon of Saturday the master of the vessel visited the beach, and returned to Astoria with the local agent of Lloyds, who had come down from there with McCabe the day before. During his short stay on the beach the master did nothing towards asserting any right to the possession of the vessel, or interfering with that of the libelants, or objecting to their action. On his way back to Astoria the master met a telegram from Portland, advising him that he had been appointed agent for the owners, and directing him to associate some one with himself, and hold a survey of the vessel, and dispose of her to the best of his ability. Thereupon the master selected his companion, Lloyds' agent, as his associate, who was also the bearer

of a message from McCabe to his clerk in Astoria to buy the vessel if she was offered for sale, and they two, concluding that they had already held a sufficient survey of the vessel, went on to Astoria that evening, and then and there sold her and her cargo, without any further notice or other bid, so far as appears, to McCabe's clerk, as a wreck, for $450,—there being an understanding at the time between said agent and McCabe that the former should have an interest in the venture if the sale was made, as they expected it would be. McCabe went to Astoria on Sunday, and returned on Monday, when he told the libelants that he had purchased the vessel, and insisted that they should cease their work, and deliver the possession of the vessel and property to him, at the same time saying they should be paid for what they had done. The libelants refused to quit work or surrender possession of the property, but told McCabe he might continue to work with them as a salvor, or, that they were willing to stand in with him on the purchase, which they thought he ought to have made for the benefit of the whole party, as they had agreed beforehand to bid as high as $3,000 for the wreck, if it was sold. But they would not allow him to take exclusive possession, nor put a gang of men on board to work on his account. McCabe would not accept their proposition, and they would not yield to his demand; and therefore the former did nothing more towards saving the property, and the libelants continued their operations until about November 10th, when they surrendered the vessel to the claimants. The only means they had of saving the material, besides the line from the foretop, were ox teams which they hired from the neighboring settlers. At low tide these were driven in the surf within 30 to 40 feet of the vessel, and loaded from the yard-arm with heavy articles, which were hauled ashore. There the sails and other perishable materials were stored in a tent until they could be removed to Skipanon by wagon, and thence boated to Astoria, where they are now stored. The anchors and chains were left well up on the beach, where they are now, buried in the sand. According to the testimony of McCabe he had the men and means at his command wherewith to have placed a donkey engine of 7,000 pounds weight on the vessel by Tuesday, and taken out the cargo in a few days, and thereby enabled the vessel to come ashore, out of the breakers, to a place of comparative safety, from which she might have been thereafter gotten out to sea again at some convenient time. But it does not appear that the men were on the ground, nor that the engine was ever any nearer than Astoria. After the libelants gave up the wreck, McCabe employed Thomas Doig, one of the libelants, and some four or five others, who removed from the vessel for him two anchors, weighing between three and four thousand pounds each, by lowering them from the yard-arm into a wagon and hauling them ashore. It also appears from the evidence that by Monday the vessel was beginning to fill from the water pouring in at her after-lights and companion way, and that by Wednesday the whole cargo

of cement was wet and ruined. The vessel remained intact until about February, when she broke up and went to pieces.

My conclusion from the circumstances is that the Cairnsmore, when found by the libelants, had been abandoned by her master and crew without the hope of recovery or the intent to return and reclaim her. She was then derelict, and liable to be taken possession of by the first comer. 2 Pars. Shipp. & Adm. 288; Cohen, Adm. 78. Waiving inquiry into the *bona fides* of the sale to the claimants, and assuming that it was good as against the libelants, the claimants only succeeded thereby to the rights and interests of the former owners. As against the latter or their vendees, the libelants had the lawful possession of the property, and were entitled to keep the same so far and so long as was necessary to enable them to complete the salvage service in which they were engaged. But the rights of the libelants were qual-, ified by the circumstance of their power or competency to perform this service. And if it was manifest that with their means they could not save the property as well or as surely as others who might offer to assist or take part in so doing, they were bound to allow such others to engage in the undertaking. 2 Pars. Shipp. & Adm. 279–281. The claimants, as owners, had also the right to participate in the saving of the property, so far as such participation was plainly necessary to that end. And it is clear that such necessity existed as to the cargo, for the libelants were not prepared to get it out with the dispatch which the circumstances required. Indeed, it is very doubtful if the claimants could have gotten out one-third of it, even if they had succeeded in getting an engine on board by Tuesday. But it may be that, if the dead-lights and after companion way had been properly closed, the water might have been kept out of the hold longer and more might have been saved. Besides, as the cargo came out, the vessel would have risen up and come ashore out of the breakers, and been less liable to take in water. But the claimants were not entitled to the exclusive possession of the vessel, or to deny the libelants their right to salvage for the property already saved, or to prevent them from doing what they could to save more of it. The law favors the first salvors, and does not allow others to share with them in the enterprise and compensation, unless and only so far as there is a necessity for it. *The Ida L. Howard*, 1 Low. 2; Cohen, Adm. 82.

The claimant McCabe mistook his rights when he demanded that the libelants should "give up the ship" and turn the whole matter over to him. The libelants refused to comply with this demand, as they had a right to. And although they may have been acting under the apprehensions that they had a right, under the circumstances, to prevent McCabe from putting an engine on board, and thus aid in saving the cargo, they never actually refused to accede to any such proposition, because it was never made to him. Nor were the claimants ever in a position to make such an offer, for they had no such means or appliances on the ground or in sight, and now only claim

that they were within their reach, and, if the libelants had absolutely surrendered the possession of the vessel to them, as they required, they would have brought them into use.

The claimants' case is not one that appeals strongly to one's sense of justice. McCabe, while acting as a salvor with the libelants, privately purchased the wreck from under them, at a covert sale, for a nominal sum, and then not only refused to admit them to share in it, but actually undertook to deprive them of their possessions and right as the first salvors.

Neither do I find that the libelants are guilty of any such unskillfulness or negligence in the saving of this property as ought to prejudice their claims for salvage. The proportion that ought to be allowed them is not so easily ascertained. The allegations of the parties as to the value of the property saved are a great ways apart, and the proof on the subject is meager and unsatisfactory. Indeed, it was understood that there would be an admission or stipulation on the the subject, but I am unable to find any in the report of the testimony. Where the property is comparatively valuable, and is saved with but little labor or risk of life or property, the proportion allowed a savor is less than when those conditions are reversed. The time occupied in this service was considerable,—probably 40 days in all,—during which time some of the libelants were employed a portion of each day. But the time employed in the surf in getting the property ashore was only about one hour out of two, as the water was too deep or rough to work in when it was above half tide. There was little or no property employed by the libelants. The teams which were used to haul the property from the vessel were all, and the risk to them was not serious. The weather was comparatively calm and mild, and there was no particular risk to life, except from exposure to cold in the surf. Neither was there any particular skill or ingenuity brought to bear upon the undertaking by the libelants. The principal elements in the value of their service are the labor and care bestowed upon the property while removing it from a place of danger to that of safety, and the integrity and responsibility involved in keeping it safely and duly accounting for it. Add to this the risk which they took of getting nothing for their labor if they did not succeed, which in this case was not very great. Allowing that the libelants were engaged in the work of saving this property 40 days, $5 a day for each of them during the whole period, or $2,400 in all, in addition to the $383.82 in money which they expended for teams on the beach, transportation to Astoria, labor, and supplies, seems to me a very reasonable compensation for their care and labor. But if the property is only worth $2,500, as alleged by the claimants, there would not be that much left after paying the costs of the proceeding; whereas, if it is worth $8,000, as alleged by the libelants, and my impression is that this figure is much nearer the truth, the half or one-third of its value might be sufficient compensation to the libel-

ants both for their services and expenses. The reward for salvage service is affected, among other things, by the value of the property saved. This is one of the risks which wreckers take. *The Albion Lincoln,* 1 Low. 75. But in the case of a derelict, when the salvage service is considerable and the value of the property saved inconsiderable, the whole may be awarded to the salvor. *The Zealand,* Id. 1. Under the circumstances, the safest course to pursue in the matter is to make an order for the sale of the property,—a thing which ought to have been done long since, on the application of one or both of the parties,—and reserve the final award of salvage until the value of the property is thus ascertained. In the mean time, if the parties are willing to abide the general ruling in the case, they may agree, without any further proceeding, upon a disposition of the property in accordance with these suggestions.

A decree will be entered that the libelants are entitled to salvage, the amount of which will be determined when the value of the property is ascertained upon a sale thereof, which is now ordered.