# MURPHY *v.* DUNHAM.

*(District Court, E. D. Michigan.* April 15, 1889.)

1. **MARINE INSURANCE—ABANDONED CARGO—SALE.**
   The cargo of a vessel sunk in forty feet of water and abandoned to the underwriters is the proper subject of a sale by such underwriters to a third person.

2. **SAME.**
   Such cargo is not by the common law a wreck of the sea. Wreck of the sea is confined to goods cast upon the shore, or to jetsam, flotsam, and ligan.

3. **LIMITATIONS OF ACTIONS—TREASURE-TROVE.**
   The year and a day fixed by the statute of Westminster within which the owner of wreck is bound to make his claim, begins to run from the day the goods are actually taken and seized by the finder.

4. **STATES AND STATE OFFICERS—TITLE OF STATE TO PROPERTY SUNK IN LAKE MICHIGAN.**
   The United States has no title to property sunk in the bottom of Lake Michigan, as the proprietorship of the state extends to the center of the lake, subject only to the right of congress to control its navigation.

5. **SAME.**
   The title of such property when sunk off the coast of Illinois does not vest in the state of Illinois by virtue of any state statute.

6. SALVAGE—RIGHTS OF OWNER.
   It seems that the title of the owner to property lying at the bottom of the
   sea is not divested, however long it may remain there, and that no other per-
   son can acquire such title except by a condemnation and sale in admiralty.

7. SAME.
   A cargo of coal lying at the bottom of Lake Michigan was raised by the
   owners of the vessel, acting under the advice of counsel, after notice by the
   owner of the coal of his claim of title, and was disposed of in Chicago at
   private sale. *Held,* that the owner of the cargo was entitled to recover its
   value, less the necessary expense of raising it and carrying it ashore by the
   most approved appliances for that purpose.

(*Syllabus by the Court.*)

In Admiralty.

This was a libel for the tortious conversion of 981 tons of coal. The
facts were substantially as follows: About the 12th of May, 1883, the
schooner Wells Burt, of which respondent Dunham was the owner,
started from Buffalo with a cargo of 1,375 tons of chestnut coal, con-
signed to Chicago. On the 18th of May she arrived off Evanston, Ill.,
where she was last seen at anchor. A heavy storm swept the lakes that
night, and when it abated the schooner had disappeared, having foun-
dered at her anchorage with all on board, neither man nor animal sur-
viving. The whereabouts of the schooner were wholly unknown until
some time afterwards. The schooner was partially insured, the uninsured
interest being worth from eight to ten thousand dollars. Respondent
abandoned "all his right, title, and interest" in her to the underwriters
as a total loss, "reserving, however, the benefit of salvage, (if any.)"
The cargo was insured in the Continental Insurance Company, and was
also abandoned to the underwriters immediately after the loss. On the
30th of June, six weeks after the vessel foundered, Lorenzo Dimick, acting
as the agent of the Continental Insurance Company, the underwriters
of the cargo, made a bill of sale of the cargo to the libelant Murphy.
The consideration expressed in the sale was $1,500, but no money
passed from Murphy to Dimick, a settlement being made by deducting
some charges of a wrecking company of which Murphy was president,
for services upon some work in which the insurance company was in-
terested. At this time, neither Murphy nor the insurance company
knew the whereabouts of the wreck. Prior to this sale, however,
respondent seems to have sent out a diver by the name of Falcon,
who on his return represented to the respondent that the wreck lay some
three or four miles north of Evanston, a village about 10 miles north of
Chicago. This was some time in the month of May. Some time in
July or August, however, her location was definitely ascertained by the
libelant through one Clark, a diver, sent for that purpose. There seems
to have been no difficulty in finding the wreck, but libelant seems to
have been the first to locate it definitely, through Clark, who obtained
the use of one of respondent's tugs for that purpose. His opinion was
that the cargo could not be saved, if saved at all, except at a cost ex-
ceeding its value, by the aid of any existing or known machinery. The
schooner lay in about 40 feet of water, at or near the spot where she
was last seen at anchor. No attempt was made to raise the schooner or

her cargo during that season; but there was some evidence that, soon after the purchase, libelant began building an elevator, which he claims was intended for this purpose, but, as witness stated upon his cross-examination that he began building the elevator in April, four months before the schooner was found, for another wrecking enterprise, and as it was never constructed so as to have been of any service in raising this coal, it seemed extremely doubtful whether it was ever intended for that purpose.

On the 31st of January, 1884, the respondent, Dunham, addressed a circular letter to the underwriters of the vessel and to Murphy, the libelant, in which he said:

"Please take notice that I, as part owner of the schooner Wells Burt, am desirous of raising and restoring said vessel, and saving her cargo. You, having an interest in said vessel, have a right to determine whether you will rescue said vessel and cargo or abandon the same to whomever may attempt it. I will proceed to save said cargo if you will, within thirty days, let me know what your wishes are in the premises; and, unless I hear from you in writing at the expiration of said time, I shall infer that you abandon the same as a total loss, and that I am at liberty to save what I can."

To this the underwriters made somewhat evasive answers, without expressing any intention of saving or joining in saving the property. Libelant replied, under date of February 15th, as follows:

"In reply to your favor of Jan. 31st, would say that I do not abandon my interest in schooner Wells Burt and cargo, nor authorize you or any party to save what you can from same, but hereby give you due notice that I have already begun preparations for rescuing the same."

Murphy visited Chicago some time after that, called upon Dunham, and tried to buy his interest in the schooner. Nothing further was done until about the middle of June, 1884, when respondent fitted out an expedition, buying a special pump for the purpose, at an expense of $3,000, and went to work to save the cargo and vessel, confessedly without any license or authority, express or implied, from the underwriters or from Murphy.

Before beginning work, however, and on the 4th of June, respondent, through his proctor, Mr. Rae, applied to the secretary of the treasury, asking that official to authorize some one to make a contract in behalf of the United States, under the provisions of Rev. St. § 3755, for the recovery of the property, if the secretary should be of the opinion that the vessel and cargo were property that "ought to come to the United States" within that section. He received no reply to this communication. Respondent worked at the wreck 28 days, at times being compelled to suspend on account of the weather, and succeeded in raising 981 tons of coal, which he took to Chicago and sold in open market for the best obtainable price, viz., $4,515.25. In saving this coal, with the anchors, chains, etc., he incurred an expense of $5,487.27, or a loss to himself of $527 upon the whole expedition. He limited his operations entirely to the cargo, saving all that it would pay to get, and made no effort to recover the vessel. During the operation of saving no one ap-

peared to assist, either with money, means, or appliances, and the consignee in the bill of lading, upon notice of the arrival of the coal at Chicago, refused to receive the same and pay the charges, declaring that he had been paid by the underwriters. No one claimed the coal after it was saved until May, 1885, when Murphy began suit in this court. It appears that Murphy was informed of respondent's operations while the cargo was being taken out. There seem to have been about 100 tons left in the schooner.

H. H. *Swan*, for libelant.

H. C. *Wisner* and *Robert Rae*, for respondent.

Brown, J. 1. Respondent's first objection that there was no property *in esse* which could be the subject of a sale from the underwriters to the libelant I think is untenable. It is true that the property at that time lay at the bottom of Lake Michigan, and that its exact position had not then been ascertained; but only six weeks had elapsed since the vessel was lost; her location was known, approximately, and was readily ascertainable. The ownership of the coal was still unchanged, and the mere fact that libelant was willing to take and pay for a bill of sale is sufficient evidence to show that there was not only an *animus revertendi*, but a *spes recuperandi*. The cargo had not, at the time of the sale, been converted, nor was it in the adverse possession of a third person, as was the case in *Gardner* v. *Adams*, 12 Wend. 297; *McGoon* v. *Ankeny*, 11 Ill. 558, and *Dunklin* v. *Wilkins*, 5 Ala. 199, and the mere absence of present control over it was not sufficient to invalidate the sale. In this respect the case is much like that of *Barr* v. *Gibson*, 3 Mees. & W. 390, in which it appeared that, at the time of the sale, the ship was on a foreign voyage, and had gone ashore and suffered great damage, but it was not until after the sale that she became a total loss. It was held that upon this evidence the subject of transfer did exist in the character of a ship, although at the time she might have been a total loss within the meaning of a contract of insurance. I understand that any existence of a thing sold, beyond a mere right of action or a mere possibility or expectancy, may be the subject of a sale, even though the property be beyond the reach of the vendor or vendee, or in the actual possession of a third person. *Tome* v. *Dubois*, 6 Wall. 548; *The Sarah Ann*, 2 Sum. 206; *Low* v. *Pew*, 108 Mass. 347.

Undoubtedly if the thing has ceased to exist under the name by which it is sold, as, if an article of jewelry be melted, or a ship has gone to pieces upon the rocks, the sale is void. 1 Benj. Sales, pt. 1, c. 4. In such case the buyer does not get what he bargains for; but in this case the situation of the coal, and the fact that it was submerged, were perfectly well understood by both parties, and there was not the slightest uncertainty in the minds of either as to what the subject of the transfer was.

2. Respondent further assumes that the failure of the libelant to take proceedings to gain possession of the coal within a year and a day from the time of the loss, or from the time its locality was discovered, was a

practical abandonment of his right to it, and was sufficient authority for the respondent or any one else to undertake its salvage, and that the property when saved belonged either to the United States, or to the state of Illinois in its sovereign capacity, or to himself as the finder.

What shall be treated as wreck of the sea, and to whom such wreck shall be considered as belonging, has been a fruitful subject of discussion from the earliest historical period to the present day; and the disposition of goods found on or beneath the sea, or thrown upon the shore, is usually a fair index of the degree of civilization reached by the people within whose domain such property is found. In a barbarous state of society wrecks were treated as the lawful plunder of the first comer, or the lord of the soil, and the crews were either put to death, or seized and sold as slaves. By the laws of the ancient Rhodians, both ship and goods were seizable by the lord of the place, though all the persons were saved and alive; while the Romans, with greater humanity and regard for private rights, were particular and express in forbidding any man to meddle with such goods as were wrecked; in making the plunderer return four-fold, and in declaring that they remained the property of the original owner without escheating to anybody, unless for want of claim within a year and a day, (whence the common law period seems to have originated,) in which case they escheated to the exchequer. 1 Browne, Civil & Adm. Law, 238. These enlightened provisions, however, did not long survive the fall of the Roman empire. We have abundant evidence to show that during the middle ages it was a common practice to confiscate the cargoes of shipwrecked vessels as the property of the lord upon whose manor they were thrown. Not only this, but by the exhibition of false lights and collusion with pilots ships were lured or steered upon rocks, that the harvests of the sea might be made more abundant. The Laws of Oleron furnish striking evidence of the barbarity of this period, wherein it is said, (article 31,) "that in many places they (the mariners) meet with people more barbarous, cruel, and inhuman than mad dogs, who, to gain their moneys, apparel, and other goods, do sometimes murder and destroy these poor distressed seamen." It would also appear from article 46 that bishops, prelates, and clerks were not above becoming partakers and consenters to the plundering of wrecks. By articles 25 and 26 the most fearful punishments are denounced upon pilots who "guide and bring ships upon the rocks," and landlords who connive at so doing, for the purpose of taking advantage of "an unreasonable and accursed custom in some places that the third or fourth part of the ships that are lost shall accrue to the lord of the place where such sad casualties happen." The right of the lords upon the coast of France to shipwrecks, was secured to them by the cruel law of *Droit de Bris sur les naufrages,* and was put in practice by the Gauls, who took all strangers for their enemies, and not only robbed them of their goods but of their lives.

Article 30 of the Laws of Oleron provided for the salvage of goods driven ashore, or remaining floating upon the sea, where the crew were all drowned and required notice to be given, and the goods to be kept

for a year or more; and in case the owner did not appear within that time, for the public sale of the goods, and the disposal of their proceeds to charitable purposes.    By article 34, "property found" in the. sea, or upon the shore, in floods or in rivers, if it be precious stones, fishes, or any treasure of the' sea, which never belonged to any man in point of property, was adjudged to the first finder.    But by article 35 and article 36 if the owner appears, the property shall be restored to him without diminution, except perhaps for his own pains.    By the maritime ordinance of Trani it is provided, in section 19, that goods found floating on the sea shall be delivered up to the court within three days, and of the goods so recovered, the finder shall have one-half, if the owner is found; and if at the end of 30 days the owner shall not appear, the goods shall belong to the finder.    By section 20, if any person finds goods under water, two-thirds of them shall belong to the finder, and one-third to the owner, in case the goods have a mark upon them.    4 Black Book Adm. 537.

 ·   A somewhat similar disposition is made of goods found floating upon the water, or which the sea has cast up upon the land, by the customs of the sea, (3 Black Book Adm.439;) but it is declared that "if by chance goods shall be found which lie at the bottom, of a kind which did not and could not float upon the water, they ought not to be sold or alienated, because, as goods lying at the bottom they always awaited their owner." "There ought, however, to be given suitable recompense to him who shall have found them."

By the common law of England it would appear that property found floating at sea, by which we mean more than a marine league from the shore, belonged to the finder.    Thus, Britton says, (lib. 1, c. 17:) "Of treasure hid in the ground, the king will have it, and if it be found in the sea, be it to the finder."    And, again: "If found on the shore, they (the shipwrecked goods) are a wreck and belong to the king; but if they are found in the sea further off from the shore, then whatever has been found shall belong to the finder, because it may be said to be then no man's goods; the king no more than a private person."    By the statute (3 Edw. I. c. 4,) known as the "Statute of Westminster," it is provided, that, "concerning wrecks of the sea, it is agreed that where a man, a dog, or a cat escape quick out of the ship, that such ship, nor barge, nor anything within them shall be adjudged wreck, but the goods shall be saved and kept by view of the sheriff, coroner, or king's bailiff, and delivered into the hands of such as are of the town where the goods are found; so that if any sue for those goods, and after proof that they were his, or perished in his keeping, within a year and a day, they shall be restored to him without delay; and if not, they shall remain to the king, and be seized by the sheriffs, coroners, and baliffs, and shall be delivered to them of the town, which shall answer before the justices of the wreck belonging to the king.    And, where the wreck belongeth to another than the king, he shall have it in like manner."    It is upon this statute, which is assumed to be a part of the common law of this country, that defendant relies for his claim that the libelant lost his property in the

coal in question by reason of his failure to appear within a year and a day to make claim to it. The statute, however, seems to be merely declaratory of the common law, and the fact that no dog, nor cat, nor other animal came alive ashore, did not by any means prove that the goods were a wreck, or forfeited. *Hamilton* v. *Davis*, 5 Burrows, 2732, 2738. It was said in that case that "if the owner of the dog or cat or other animal was known, the presumption of the goods belonging to the same person would be equally strong, whether the animal was alive or dead. If no owner could be discovered, the goods belonged to the king. But there ought to be a reasonable time allowed to the owner to come in and claim them." "The old limitation was a year and a day, which was the time limited in many other cases." The only significance of the dog or cat was in raising a presumption (which seems somewhat far fetched) towards ascertaining the owner of the goods. At any rate the modern system of marking goods has completely supplanted this primitive and inconclusive proof.

But I think this statute has no application to the case under consideration for two reasons:

*First.* The coal lying at the bottom of the lake was not by the common law wreck of the sea. Lord Hale in his treatise De Jure Maris, 37, speaking of wreck, says: "The kinds of it are two: *First*, such as is called properly so, the goods cast upon the land or shore; *second*, improper, for goods that are a kind of sea waifs or stray; flotsam, jetsam and ligan." This coal had never been cast upon the land or shore, and hence was not wreck proper. It was not flotsam, because it did not float upon the water. It was not jetsam, because it never had been cast into the sea to save the ship; nor was it ligan, because the very definition of the word from the Latin "*ligo*," to bind, indicates that it must be buoyed; but it was simply property lying at the bottom of the sea, which "awaits its owner." 1 Bl. Comm. 290–295; 3 Black Book Adm. 441, 445; 4 Black Book Adm. 517; Ang. Tidewaters, c. 10; *Baker* v. *Hoag*, 7 N. Y 555.

*Second.* The year and a day does not begin to run from the day of the wreck, nor from the time the goods were first discovered, but from the day the goods are actually taken and seized by the finder. Thus, in the case of *Dunwich* v. *Sterry*, 1 Barn. & Adol. 841, 842, it is said that this year and a day dates from the seizure and actual possession of the lord; "for, until then," says Lord Coke, "it is not notorious who claims the wreck, or to whom the owner shall repair to make his claim, and show him his proofs." This also corresponds to the modern English statute upon the subject of wrecks, (17 & 18 Vict. c. 104,) by which (section 470) the owner is given a year from the date at which the wreck came into the possession of the receiver to establish his claim. This suit was begun within a year after the coal was raised by the respondent. *Sir Henry Constable's Case*, 5 Coke, 105.

3. It is entirely clear to my mind that the United States has no title to this coal, even if it were to be treated as derelict, or property of which no owner could be found, since the proprietorship of the state extends

to the centre of the lake, subject only to the right of congress to control its commerce and navigation. *Pollard's Lessee* v. *Hagan*, 3 How. 212, 230; *Barney* v. *Keokuk*, 94 U S. 324, 338.

4. Nor is there anything in the statute of Illinois which indicates that the title ever became vested in the state. The only statute having any connection with the subject is limited to "water-craft, timber, or plank found adrift on any water-course within the limits or upon the borders of this state,"·and has no application to any other species of cargo. Starr & C. Ill. St. c. 50, § 21. It could only become the property of the state by applying the common-law doctrine of escheat:

Indeed, after careful search of all the authorities upon the subject, I can find nothing to indicate either that of wrecks of the sea, or property lying at the bottom of the sea, which can be identified by its owner, the owner loses his title, provided he appears within a year and a day to make claim to it. The salvor of such property may, undoubtedly, retain possession of it until his compensation is paid, or may take proceedings to procure a judicial sale in admiralty, and upon such sale it is not unusual to award the whole of the proceeds to the salvor, particularly if his expenses have exceeded the value of the property, but in no other way can the title of the owner be divested.

I was at first inclined to the opinion that the respondent possessed rights in this case superior to those of a mere stranger, by means of the reservation in his abandonment of the "benefit of salvage," but I am satisfied upon reflection that these words refer, not to the right to save the ship, but to his uninsured interest in whatever might be saved by the underwriters, or any other person undertaking the work of salvage. The primary signification of the word " salvage " is the thing or goods saved from shipwreck or otherwise ; and in this sense it is frequently understood, though more commonly used to denote the compensation made to those who have saved property in peril at sea. Conceding, upon the authority of *The Manitoba*, 30 Fed. Rep. 129, that an absolute abandonment of a vessel, and of all right, title, and interest of the owner thereto, extends as well to the uninsured as to the insured interest of the owner, about which there seems to be some conflict of opinion, the insured by this clause intended to reserve to himself the benefit of such proportion of the property saved as would be appropriate to his uninsured interest.

5. Regarding it then as settled that the libelant had a valid title to this coal, and that respondent was a trespasser in interfering with it, it only remains to consider the question of damages. If respondent had taken this coal to Chicago, and promptly libeled it for salvage, or had retained possession of it until his claim was settled, it is probable that the court would have awarded him a large portion, if not the entire proceeds, of its sale. But instead of this he assumed to dispose of it at private sale, and now upon a showing that his expenses exceeded the amount of such proceeds, demands either that the libel be dismissed, or nominal damages only be awarded. Upon the other hand, libelant claims that, as the trespass was willful and deliberate, he should be

awarded the entire proceeds of the sale at Chicago, or at least what the coal was worth when it was raised from the wreck and placed upon the lighters. There is, it is true, an abundance of cases, chiefly for the conversion of timber, which hold that where the defendant is a willful trespasser the owner will be awarded the full value of the property at the time and place of demand or of suit brought, with no deduction for labor and expenses in cutting the timber and floating it to a market. *Wooden-Ware Co.* v. *U. S.*, 106 U. S. 432, 1 Sup. Ct. Rep. 398; *Bly* v. *U. S.*, 4 Dill. 464; *Martin* v. *Porter*, 5 Mees. & W. 351; *U. S.* v. *Mills*, 9 Fed. Rep. 684.

In *Grant* v. *Smith*, 26 Mich. 202, this right to the full value of the timber cut is put upon the ground that the owner of the pine tract is frequently desirous of retaining the timber for an appreciation of the land, and ought not by the willful trespass of another to be compelled, practically, to sell it at its then stumpage value, and lose his chance for a rise in price. This argument, however, obviously has no application to a case of this kind, as the value of the coal at the bottom of the lake was all that ever could be realized from it.

I regard the rule above stated as too severe to apply to a case of this description. While the respondent was in one sense of the word a willful trespasser, in that knowing, or being bound to know, libelant's rights, he acted in defiance of such rights ; still his conduct was wholly lacking in that element of furtiveness and bad faith which appears in the case of *Livingstone* v. *Coal Co.*, L. R. 5 App. Case 25, to have been regarded by Lord HATHERLEY as the chief factor in determining the court to this harsh measure of damages. Both vessel and cargo, in this case, had been abandoned by their owners, and for some time their location was unknown. Both were within the meaning of the law derelict, and the fact that libelant subsequently discovered their location, purchased the coal, and intended at some future time to raise it, did not deprive it of the character which was fixed upon it by the loss and abandonment. *The Laura*, 14 Wall. 336; *The Coromandel*, Swab. 208; *L'Esperance*, 1 Dod. 46 ; *The John Gilpin*, Olcott, 78 ; *The Fairfield*, 30 Fed. Rep. 700 ; *The Ann L. Lockwood*, 37 Fed. Rep. 233.

Before acting, respondent took the advice of counsel experienced in the law of the sea, and notified the underwriter and owners of the vessel and cargo of his intention to raise them. He made no concealment of his movements, and waited until long after the opening of navigation of the year following the loss before beginning operations. It is incredible that he would have gone to the expense he did in fitting out this expedition, for the mere purpose of plundering, or without believing he had some rights in the vessel by virtue of his reservation of the benefit of salvage. Indeed, I am not prepared to say that he had not the right to raise the vessel and save his uninsured interest. The circumstances under which he raised the coal relieved him I think from the charge of being a felonious or even willful trespasser in the ordinary sense of the term. At the same time it would be equally unjust to charge him only with the value of the coal as it lay at the bottom of the lake, taking such

value at his own estimate. Libelant had bought the coal with the idea of making money out of his purchase, and believing doubtless that he could procure appliances for saving it at a cost much less than the value of the coal in Chicago. He was entitled to the benefit of his bargain, and ought not to lose his expected profit except upon satisfactory evidence that he was mistaken in his estimate of the cost of raising it, and that no profit could have been realized by the use of the most approved appliances for such purpose. If respondent pursued an injudicious and unnecessarily expensive course, libelant ought not to be charged with his failure to realize a profit. I think the true measure of damages in this case is the value of the coal in Chicago, less the necessary expenses of raising it and carrying it ashore by the use of the most approved appliances for that purpose, and that the case should be referred to a commissioner to make such estimates upon the best evidence he can procure. If the court is satisfied that such expense could not have been less than the value of the coal, the decree will be entered for nominal damages only.