### THE BURLINGTON.

### GRUMMOND v. THE BURLINGTON.

.(District Court, E. D. Michigan. February 7, 1896.)

1. MARINE INSURANCE—ABANDONMENT.

When the insured is paid as for a total loss, the property insured passes to the insurer without any formal abandonment.

2. SALVAGE—REMOVAL OF WRECK—OBSTRUCTION TO NAVIGATION.

Under the Canadian statute giving to the minister of marine and fisheries authority to cause the removal of any wreck which, in his opinion, constitutes an obstruction to navigation, his decision that a particular wreck on the Canadian side of the Detroit river is such an obstruction is not reviewable by the courts of this country, and is sufficient to protect any person, authorized by him to undertake the removal, from any claims of the owner of the wreck for an unlawful interference with his property.

3. SALVAGE—DERELICT VESSEL.

The fact that a sunken wreck is allowed by her owners to remain for nine months in a position where she is exposed to further injury, and where she is a serious obstruction to navigation, and is likely to become a source of danger to vessels navigating in the vicinity, is sufficient to establish her character as a derelict, so as to make her a proper subject of salvage.

4. SAME—COMPENSATION—DERELICT.

Where the work and expenditures actually employed in raising a wreck abandoned by the owners far exceeded the value of the property recovered, and it was clear that the property could not have been rescued without an outlay exceeding its value, held, that the entire proceeds should be awarded to the salvors, and that, as against them, no compensation should be awarded to a vessel which had endeavored to put out the fire causing the wreck, where the benefit of her services was lost by the sinking of the vessel.

This was a libel by U. Grant Grummond against the steam barge Burlington and cargo to recover compensation for salvage services.

The libel in this cause claims salvage for the raising and removing to this port of the steam barge Burlington and the remnant of her cargo of lumber, which lay almost entirely submerged near Sandwich Point, on the Canadian

side of the Detroit river, about three miles below Detroit. While on a voyage from Bay City to Cleveland, Ohio, having on board a cargo of lumber, on the 16th day of April, 1894, the Burlington took fire; and, all efforts to extinguish the flames failing, she was headed for the Canadian shore, and there beached, with her bow in about eight feet of water. In this position, she continued to burn, and, by reason of the injuries done to her hull by the fire, she filled, and sank with her stern in about 30 feet of water, her bow holding its place where she was beached. Her deck load and upper works were entirely consumed. Much of the lumber in her hold was also injured, and great damage was done to her hull. Some time after the vessel had been stranded, the municipal fireboat Detroiter was obtained, and by her aid the progress of the fire was checked. The Burlington had, however, already suffered such damages in her hull as to make it impossible to keep her afloat, and the only benefit derived from the aid of the Detroiter was the prevention of further injury by fire to the charred hull and the cargo in the hold. No effort was made by the owner of the Burlington to remove her from the position in which she lay, nor did he manifest any intention of looking to the raising of the vessel or the unlading of the remnant of her cargo. She was suffered to remain where she sank until about the 8th day of December, 1894, when the libelant, having obtained the use of the tug Champion and a wrecking outfit, and having employed an adequate crew for the work, undertook to raise and remove the vessel and cargo. On April 16th and 17th, libelant communicated by telephone and telegraph with G. K. Jackson, of Bay City, the legal owner of the Burlington, and endeavored to make a contract with him for the recovery of the wreck for $300, "No cure, no pay," or to furnish a tug and lighter for that purpose for $175 per day. Libelant testifies that Jackson then disclaimed ownership or interest in the property, and referred him to the general agents of the insurers of the steamer. This is denied by Jackson, who, though not sworn as a witness, it was admitted upon the hearing, would testify that he simply declined to have anything to do with libelant, or to sanction his effort to raise the vessel. Libelant had also, before entering upon the work, made telegraphic inquiry of the insurer's agents at Buffalo, who also disclaimed all interest in the vessel and cargo. On the 11th day of December, 1894, after libelant had commenced work on the wreck, Jackson's attorney wrote libelant, stating that Jackson had not abandoned the Burlington or her cargo, and did not recognize the right of libelant or any person to undertake the salvage thereof, and requested Grummond to desist from interference therewith. No purpose was expressed by Jackson at any time to raise the vessel in his own interest.

The Burlington lay on the Canadian shore, somewhat out of the path of vessels navigating the Detroit river, yet with her stern in such a depth of water as might be used safely by such vessels when occasion required. By the Canadian statute (1 Rev. St. Can. 1886, p. 1239, c. 91) it is provided that "if, in the opinion of the minister of marine and fisheries, the navigation of any navigable water, as aforesaid, is obstructed, impeded or rendered more difficult or dangerous by reason of the wreck, sinking or lying ashore or grounding of any vessel or of any part thereof, or other thing, the said minister may, under the authority of the governor in council (if such obstruction or obstacle continues for more than twenty-four hours) cause the same to be removed or destroyed in such manner and by such means as he thinks fit, and may use gunpowder or other explosive substance for that purpose, if he deems it advisable, and may cause such vessel or its cargo or anything causing or forming part of such obstruction or obstacle to be conveyed to such place as he thinks proper, and to be there sold by auction or otherwise as he deems most advisable, and may apply the proceeds of such sale to make good the expenses incurred by him in placing, and maintaining any signal or light to indicate the position of such obstruction or obstacle, or in the removal, destruction or sale of such vessel, cargo or thing, paying over any surplus of such proceeds to the owner of the vessel or thing sold or other persons entitled to such proceeds or any part thereof respectively." November 21, 1894, one J. A. H. Campbell made a tender to the department of marine and fisheries of Canada, under the provisions of this statute, for the removal of the wreck, offering to accept, in full payment of his services in connection with the work, everything that he might be able to recover from the wreck, and proffered

other terms for the performance of the work looking to the complete clearing of the channel from any obstruction arising from the wreck. This tender was accepted by that department by telegram dated November 23, 1894. On the 5th day of January, 1895, the minister of marine and fisheries officially certified to Campbell, inter alia, "that, evidence having been produced that such removal [of the wreck of the Burlington] has been completed, the said wreck and cargo have been, and are hereby, handed over to you for your sole use and benefit." Claiming under the authority thus given to Campbell, although the proofs fail to show that Campbell authorized libelant to raise the wreck, libelant, on the 8th day of December, commenced the work of raising the Burlington. Owing to her position and her badly damaged condition, this task was found much more difficult than had been expected. The after-hold and the engine room of the steamer were filled with mud. The fire had so greatly injured the hull as still further to increase the difficulties of the undertaking, and the engine of the steamer had suffered so greatly from the heat as to be practically worthless. The cargo also had suffered serious detriment while so long submerged, by reason of the sediment deposited upon it by the action of the water. The work was prosecuted vigorously, the crews of the tug and lighter and the laborers (some 25 men in all) working 18 to 20 hours per day, until December 22d, when the vessel was raised. The libelant expended, for the purchase of timber and in the hire of chains for the raising of the tug, several hundred dollars. The work required the employment of the tug Champion, two lighters, and a diver, besides the usual outfit of steam pumps and other necessary appliances. The position in which the steamer lay was such as to expose her to the effect of ice, and the evidence is undisputed that, had she been permitted to remain at the place of stranding during the winter, the ice would have crowded her into deeper water, where she would have been a still more serious obstruction to navigation. The steamer was raised after removing some three or four hundred tons of mud from her hold, and taken to Detroit, when such was the condition of her hull that she was sunk by the ice, while lying in a comparatively sheltered slip. To recover compensation for his services, the libelant filed this libel, wherein he claims $7,500 salvage. The steamer and cargo were sold pendente lite. The proceeds in the registry amount to about $1,100, and it is conceded that the vessel could not have been raised for that sum. The evidence of the libelant, which is uncontradicted, is that it was worth from five to six thousand dollars to salve the steamer and cargo, and bring them to Detroit.

After the burning of the Burlington, suit was brought against her insurers by G. K. Jackson, who held the legal title of the vessel as trustee, and he recovered, as for a total loss of the vessel, the full amount of the policy. It is admitted that the judgment has been satisfied by the insurers. The policies sued upon were against fire, although in the ordinary form of lake hull policies, the limitation of the risk insured against being expressed by a rider upon the policy, reading as follows: "This policy covers against fire only on the terms and conditions of the standard form policy of the state of New York, and anything in this policy conflicting therewith is hereby waived. This policy covers the property as hereinbefore described only while in board or attached to said vessel. * * *" Another rider is attached to the policy, which reads as follows: "N. Y. Standard. Percentage Co-insurance Clause. If, at the time of the fire, the whole amount of insurance on the property covered by this policy shall be less than eighty per cent. of the actual cash value thereof, this company shall, in case of loss or damage, be liable for only such portion of such loss or damage as the amount insured by this policy shall bear to the said eighty per cent. of the actual cash value of such property." There was no evidence given in the cause other than this last rider of any difference between the New York standard policy and that written upon the Burlington, upon which Jackson recovered against the insurers.

F. H. & G. L. Canfield, for libelant.

T. E. Tarsney and W. W. Wicker, for respondent.

SWAN, District Judge (after stating the facts). The concession that the services render by libelant in this cause were meritorious, and resulted in the salvage of the property, is not necessary to the

ascertainment of that fact. They have all the elements necessary to constitute a valid salvage claim, namely: (1) A marine peril to the property to be rescued; (2) voluntary service, not owed to the property as matter of duty; (3) success in saving the property, or some portion of it, from the impending peril. The Clarita and The Clara, 23 Wall. 16. The fund in court arising from the sale of the wreck is the product of the libelant's labor and energy and the expenditure of his means. Upon the admitted facts of the case, it is clear that whatever value the property had when sold was given to it by his efforts. In the condition in which the wreck was left, although it was not physically all destroyed, it was as much a total loss as if the fire had wholly consumed it, as demonstrated by the cost of the work actually performed in raising and removing it to a place of safety. It is not contended that this work could be done for less than the amount fixed by the testimony of the libelant as its value, and no evidence was offered in contradiction of the libelant's valuation, and we must assume its correctness. The undisputed evidence as to the condition of the steamer when the work was undertaken and prosecuted is strongly corroborative of the libelant's estimate.

It is urged by the claimant that, as there was no formal abandonment of the Burlington to the insurers, the title of the property still remains in the claimant. It appears, however, that the loss was paid in full by the insurers, and that, upon the trial of the suit brought by Jackson against the underwriters, the plaintiff insisted that, because of the totality of the loss, no abandonment to the insurers was necessary to entitle him to recover. The court sustained that contention, and its judgment was affirmed by the supreme court, where the case was taken on writ of error. Jackson having received payment on the basis of a total loss, such payment operated to transfer to the insurers the salvage of the property injured, without the necessity of a formal abandonment in writing. "Abandonment is implied as accompanying every settlement of a claim for total loss. It is unnecessary to stipulate for it. It passes without a word spoken, for it is a necessary incident of every contract, not only of insurance, but of indemnity. This abandonment takes place at the time of the settlement of the claim; it need not take place before." Lown. Ins. p. 152.

This doctrine is held by the supreme court of the United States in the case of Phœnix Ins. Co. v. Erie & W. Transp. Co., 117 U. S. 320, 6 Sup. Ct. 750, 1176, where it is said:

"When goods insured are totally lost, actually or constructively, by perils insured against, the insurer, upon payment of the loss, doubtless becomes subrogated to all the assured's rights of action against third persons who have caused or are responsible for the loss. No express stipulation in the policy of insurance or abandonment by the assured is necessary to perfect the title of the insurer. From the very nature of the contract of insurance as a contract of indemnity, the insurer, when he has paid to the assured the amount of the indemnity agreed on between them, is entitled, by way of salvage, to the benefit of anything that may be received, either from remnants of the goods or other damages paid by third persons for the same loss."

This doctrine is clearly applicable to claims in marine policies. The Manitoba, 30 Fed. 129. See, also, Wood, Ins. § 485; Rankin

v. Potter, L. R. 6 H. L. 118; Kaltenbach v. Mackenzie, 3 C. P. Div. 471. Hall v. Railroad Co., 13 Wall. 367, is to the same effect, and holds that "there can be no abandonment where there has been total destruction. There is nothing upon which it can operate, and an insured party may recover for a total loss without it."

It is laid down in Phillips on Insurance (section 1523) that "a mere payment of a loss, whether partial or total, gives the insurers an equitable title to what may be afterwards recovered from other parties on account of the loss"; and that "the effect of the payment of a loss is equivalent in this respect to that of abandonment."

In Railway Co. v. Jurey, 111 U. S. 584, 594, 4 Sup. Ct. 566, it is said:

"The payment of a total loss by the insurer works an equitable assignment to him of the property and all the remedies which the insured had against the carrier for the recovery of its value. It is immaterial whether the policy sued upon insured against fire or marine peril."

The contract being one of indemnity, it is clear, under the authorities, that its utmost requirement is satisfied when the insurer is paid for a total loss; and it is but equitable that, having thus indemnified the assured, the insurer should be entitled to the remnants of the property saved, if any.

The stress of the defense is laid upon the proposition that the Burlington was not, when libelant performed the work, the proper subject of salvage service. It is clear, however, that under the doctrine stated in the case of The Clara, supra, the condition and location of the property, and the dangers to which it was exposed, brought it within those circumstances which justified the effort to rescue it. It had lain uncared for, for nearly nine months, in navigable waters, in such proximity to the main channel, and so liable to be carried by ice into the pathway of vessels, that, under the authority conferred by the law of Canada for the removal of wrecks and obstructions in navigation, it was deemed important, in the interest of commerce, to remove it as an obstruction. It is not within the power of this court to review the action of the Canadian government or that of any of its departments upon matters within their jurisdiction. The Canadian statute, in effect, made the department of marine and fisheries a special tribunal to decide whether or not the wreck was an obstruction to navigation, and, if it should hold affirmatively on this point, to authorize its removal or destruction, in the interest of commerce. This determination must be held conclusive of the necessity of removing the property, and, upon elementary principles, would shield any persons authorized or employed by that department to perform the work. Many analogous grants of authority exist in our own legislation whereby special tribunals are created, whose determinations are not reviewable by the courts. The authority of such officials has been passed upon in numerous cases. Johnson v. Towsley, 13 Wall. 72; Steel v. Refining Co., 106 U. S. 451, 1 Sup. Ct. 389; Baldwin v. Stark, 107 U. S. 463, 2 Sup. Ct. 473. Other and later instances of the grant of like powers, and the finality of the judgments of

officers acting under them, are found in laws of the United States, excluding undesirable immigrants, and prohibiting the entry of Chinese persons into this country and in legislation of the states for the protection of fisheries and other interests. Nishimura Ekiu v. U. S., 142 U. S. 651, 12 Sup. Ct. 336; Lawton v. Steele, 152 U. S. 133, 14 Sup. Ct. 499.

By the law of Canada, the property in the soil adjacent to the shore is in the crown, subject to the public right of navigation, bathing, and fishing. Attorney General v. Perry, 15 U. C. C. P. 329. An act of congress very similar in its provisions to the Canadian statutes in question is found in 1 Supp. Rev. St. pp. 296, 369. By section 4 of that act (of June 14, 1880, p. 296), it is made the duty of the secretary of war, whenever the navigation of navigable waters is obstructed or injured by any sunken vessel or water craft, to notify persons interested therein, or in the cargo thereof, to remove the same; and, in case of their default, it is the secretary's duty to cause the same to be removed. The provisions of this statute and the amendment of August 2, 1882 (page 369), give the secretary of war the discretion to sell and dispose of sunken vessels or property in navigable waters before or after the raising or removal thereof, and the acts make appropriations for the purpose of removing such obstructions. Section 8 of the act of congress approved September 19, 1890 (26 Stat. 454), also empowers the removal of wrecked vessels and other obstructions in navigable waters after a specified time, and makes it the duty of the secretary of war to cause them to be removed or broken up "without any liability for damage to the owners of the same." The effect of the action authorized by the Canadian department of marine and fisheries was to divest the former owner of the title to the wreck, and vest the same in the grantee of the crown. Story, Confl. Laws, § 390; Whart. Confl. Laws, §§ 297, 307, 308; The Trenton, 4 Fed. 657; Green v. Van Buskirk, 5 Wall. 307. But, even if this were not true, the determination that the situation of the wreck authorized its removal, and made it fairly subject to salvage service, demonstrates that the boat and her cargo had lain so long unclaimed and uncared for as to justify the belief, both of the officials and of the public, that the property was derelict. The facts of the case are much stronger in favor of libelant's claim for salvage compensation than those which were the subject of decision in the case of Murphy v. Dunham, 38 Fed. 503, in which it was held that a vessel that had been sunk in Lake Michigan, and whose location had remained for some time undiscovered, was the subject of salvage service, and that one who removed her cargo was entitled to reimbursement for his services and outlay in recovering it, although he had abandoned the vessel to the insurers, and was notified by their grantee that he had begun preparations for its recovery. Libelant's conduct in the prosecution of this work was open, and free from concealment, and the facts that the value of the property was but a fraction of the cost of its recovery, and that libelant entered upon the undertaking under a misconception of its difficulties, and in ignorance of the changes which the elements had

wrought in the condition of the vessel, disprove any color of wrong motive in his prosecution of the work. The action of the department of marine and fisheries was an assurance to libelant of the lawfulness of his undertaking, and repels the contention that he was a wrongdoer in disregarding Jackson's request to desist from further prosecution of the work, especially as this request was not made until after libelant had begun operations for the recovery of the boat and cargo.

There is no evidence that Jackson had or expressed any intention to recover the property. It is sufficient to establish its character as derelict that its long abandonment exposed it to further injury, and in all probability would cause it to become, from natural causes, a more serious obstruction to navigation, and a source of danger and injury to vessels navigating in that vicinity. It is well settled that a mere intention on the part of owners of a wrecked vessel to ultimately rescue her cannot prevent others from becoming salvors of the property, or take from it the character of derelict. The reports abound in instances of the application of this doctrine where, under circumstances much less suggestive of the intent of the owner to abandon the property, salvage has been awarded to those who have voluntarily recovered it. The Union Express, 1 Brown, Adm. 516, Fed. Cas. No. 14,363; The Senator, 1 Brown, Adm. 372, Fed. Cas. No. 12,664; The Silver Spray, 1 Brown, Adm. 349, Fed. Cas. No. 12,857; The Ann L. Lockwood, 37 Fed. 233; The Cairnsmore, 20 Fed. 519; The Island City, 1 Black, 128; The Laura, 14 Wall. 336; The Coromandel, 1 Swab. 208; The Hyderabad, 11 Fed. 749; The John Gilpin, Olc. 77, Fed. Cas. No. 7,345; Wyman v. Hurlburt, 12 Ohio, 81.

There is no fixed rule for the compensation of salvors. The amount of the reward depends upon the circumstances of each case. The difficulties which surrounded the undertaking, the value of the property rescued, the imminence of the peril which threatened it, the danger to life and property in effecting the rescue, the value of the property hazarded in the work by the salvors, and other circumstances, are all factors in fixing the amount of the reward. Where no claimant appears, and the property is of small value, it is not unusual to award all that is saved to the salvors. Llewellyn v. Two Anchors & Chains, 1 Ben. 80, Fed. Cas. No. 8,428; The Zealand, 1 Lowell, 1, Fed. Cas. No. 18,205. The amount awarded in such cases is not merely compensation pro opere et labore, but is proportioned to the merit of the service, having in mind all the elements and considerations which attend its rendition. It is the aim of the courts to stimulate, by liberal rewards, efforts to rescue property from maritime perils. While the mere fact that the undertaking was beset with more difficulties than the salvors contemplated in entering upon it is not per se sufficient to entitle them to the whole of the property, yet where it clearly appears that the value of their work and expenditures largely exceeded that of the property recovered, and it is clear that it could not have been rescued without the outlay of a sum exceeding its value, it is only equitable that the entire proceeds of the property

realized on a fair sale should be awarded to the salvors. As already remarked, the enterprise, labors, and expenditures of the libelant have given the property here in controversy all its value. No one else has hazarded anything in its rescue. The proof is uncontradicted that the libelant will not receive more than about one-fifth of the value of the work done and the expenses of its performance. To take from him any part of the proceeds of the property under such circumstances, and bestow it upon one whose title was divested by competent authority, because of his inaction, would be simply to increase libelant's loss, and to revest the title of the property in one who has no legal or equitable ownership therein.

It was argued that, if the libelant should be held to be a salvor, the proceeds of the property could not be awarded to him solely, but a part should be decreed to the persons who obtained the services of the fireboat Detroiter, which checked the progress of the flames, and prevented a further loss by fire of the vessel and cargo. The facts do not warrant any allowance for the services of the fireboat as against the claim of the libelant. Had the fund been sufficient to pay the libelant's actual expenditures and the fair value of his work, and leave surplus for distribution, the Detroiter might be permitted to share in it, if not barred by her contract of service. But the steamer was not equipped to perform the services rendered by libelant, and bring the vessel and cargo into port. All that she did was practically lost by the submergence of the vessel, and conferred no appreciable benefit upon the salvors. The proofs fail to show that any considerable portion of the cargo in the hold was benefited by the extinguishment of the fire on deck, while it is clear that the hull of the Burlington had been so injured before the arrival of the fireboat as to make it practically worthless above the water line.

A further and insuperable objection to any allowance out of the fund by way of salvage to the Detroiter is the fact that her work was done under a contract that her services were to be paid for at all events, whether successful or unsuccessful. The Camanche, 8 Wall. 448, 477; The Excelsior, 123 U. S. 40, 49, 8 Sup. Ct. 33.

The libelant was the last salvor, and is entitled to priority, under the circumstances of the case, over all others. His services, including his necessary disbursements, were fairly worth the sum of $5,000, and a decree will be entered in his favor for that sum, with costs. The fund in the registry of the court arising from the sale of the Burlington and cargo is awarded to the libelant.