**SMIT AMERICAS, INC., for itself and on behalf of Edward J. Hosking, its employee, Plaintiff,**

v.

**THE M/T MANTINIA, her engines, tackle, machinery and other appurtenances, in Rem, and Metro Freighting Corp., and certain London and U.S. Underwriters of Insurance including Lloyd's of London who are insurers of the M/T Mantinia and the West of England Shipowners Protection and Indemnity Association (Luxembourg) Ltd., her liability insurance underwriters, in personam, Defendants.**

No. CIV. 95–2498(RLA).

United States District Court,
D. Puerto Rico.

April 22, 2003.

James T. Shirley, Jr., Haight Gardner Holland & Knight, New York, NY, Francisco G. Bruno–Rovira, McConnell Valdes, San Juan, PR, for Plaintiff.

Juan R. Rivera–Morales, Jimenez, Graffam & Lausell, San Juan, PR, Paul E. Calvesbert–Borgos, San Juan, PR, Stephen P. Kyne, Burke & Parsos, New York, NY, for Defendants.

## OPINION AND ORDER

ACOSTA, District Judge.

### INTRODUCTION

This is an action in admiralty for a marine salvage arising out of the stranding of a fully laden single hull oil tanker, the motor tanker, M/T MANTINIA, while entering the harbor of Guayanilla, Puerto Rico, on June 1, 1994. The only issue before the Court at this juncture is whether Captain Ted Hosking (HOSKING) of Smit Americas, Inc. (SMIT) took charge and directed the successful salvage operation of the MANTINIA on a voluntary basis.[1]

### THE PARTIES

SMIT is a subsidiary of Smit International (Americas) Inc. which, in turn, is under the control of Smit International BV, a large salvage company with operations and experienced salvage masters world wide. At all relevant times HOSKING, with thirty years experience, was in the employ of SMIT as a professional salvor, Rick Chiannelli (CHIANNELLI) as its Logistics Manager and Marius Hoogendorn (HOOGENDORN) was SMIT's Operations Manager.

Metro Freighting Corp. (METRO) was the owner of the MANTINIA at the time of the events under discussion. Captain Leonidas Souralis (SOURALIS) was the Master of the MANTINIA. The United States general agent for METRO and operators of the vessel was National Shipping and Trading Corporation (NSTC). Messrs. Jerry Georges (GEORGES) and George Antoniou (ANTONIOU) were directors of NSTC.

The MANTINIA's protection and indemnity (third party liability) insurer was West of England Ship Owners Mutual Insurance Association (Luxembourg) Ltd. (WOE) and her hull and machinery insurers were certain London and U.S. Underwriters of Insurance (UNDERWRITERS).

---

1. "The parties agree that the voluntariness issue may be resolved without further proceedings based solely on their submission on record." Minutes of Status Conference Held on January 30, 2003. Previously, the parties had stipulated and the Court by Order of March 9, 2000 had approved the submission of the issue of liability, as it is particularly limited by the circumstances of this case, by way of the presentation of the documentary evidence, the testimony of witnesses and legal briefs.

### NON–PARTY ACTORS

The "Qualified Individual" (QI) services for the MANTINIA, as required by the Oil Pollution Act of 1990, 33 U.S.C.A. §§ 2701–2761 (OPA 90), were provided by Hudson Maritime Services (HUDSON). The president of HUDSON was Cynthia Hudson (CYNTHIA), Per Christiansen (CHRISTIANSEN) its CEO. Retired U.S. Coast Guard Commander Hugh Williams (WILLIAMS) was the designated QI from HUDSON assigned to the MANTINIA casualty.

Commander Robert G. Ross, commanding officer of the U.S. Coast Guard Marine Safety Office in Puerto Rico, was the Federal–On–Scene–Coordinator (FOSC and/or ROSS) the official designated by the National Contingency Plan, 40 C.F.R. § 300, to act for the President of the United States in this incident. Other Coast Guard officials who responded on scene were Lt. Pablo E. Roque (ROQUE) and DC1 Dan Benningfield (BENNINGFIELD).[2]

### LEGAL OVERVIEW

In order to set forth a claim for "pure salvage" the plaintiff must establish three elements: 1) "A marine peril. 2) Service voluntarily rendered when not required as an existing duty or from a special contract. 3) Success in whole or in part, or . . . service [contributing] to such success." *Clifford v. M/V Islander*, 751 F.2d 1, 5 (1st Cir.1984); *quoting The SABINE*, 101 U.S. (11 Otto 384) 384, 25 L.Ed. 982 (1879); *see also*, 3A *Benedict on Admiralty*, § 63.

■ On the other hand "[c]ontract salvage is that type of salvage service entered into between the salvor and the owners of an imperiled property, or by their respective representative, pursuant to an agreement, written or oral, fixing the amount of compensation to be paid whether successful or unsuccessful in the enterprise." *Benedict*, § 159 at 12–2. (footnotes omitted) As quoted from *The Elfrida*, 172 U.S. 186, 193, 19 S.Ct. 146, 43 L.Ed. 413 (1898), a salvage situation under contract is of two types: (i) it could be for a specific payment which is not dependent upon the success of the rescue, *i.e.*, the amount set by the terms of the contract is owed in any event; or (ii) the contract could be for compensation in an amount which is fixed only after there has been success.[3] 172 U.S. at 193, 19 S.Ct. 146.

■ When there is a contract to undertake a salvage service or to provide some type of service to a distressed vessel,

---

**2.** Given the extensive number of persons involved in the events surrounding this litigation the following summary provides a concise list of the principle entities and individuals for easy reference:

SMIT (salvage contractor)
 1. Rick Chianelli—emergency response manager
 2. Marius Hoogendorn—operations manager
 3. Ted Hosking—salvage master
METRO (owner of MANTINIA)
 1. Capt. Leonidas Souralis
Nat. Shipping & Trading Corp. (NTSC) (agent for vessel's owner)
 1. Jerry Georges—representative
 2. George Antoniou—operations manager

Hudson Maritime Services (provided qualified individual services)
 1. Hugh Williams—retired USCG appointed QI for incident
 2. Per Christensen—CEO—replaced by Hugh Williams 6/3/94 at 1:45 a.m.
 3. Cynthia Hudson—president

**3.** The contract in the maritime industry that ties the amount of compensation to the degree of success is the *"Lloyds Open Form"*. *See gen.* T. Schoenbaum, *Admiralty and Maritime Law*, § 16–6, at 333–34; *see e.g., Jones v. Sea Tow Services Freeport New York, Inc.*, 30 F.3d 360, 364–65 (2nd Cir.1994). Although offered repeatedly by SMIT, there is no dispute in this case that the parties ever entered a Lloyds Open Form contract.

there is no "pure salvage". This is because to be "voluntary" there must be an "absence of a legal duty or obligation," *B.V. Bureau Wijsmuller v. United States,* 702 F.2d 333, 338–39 (2nd Cir.1983), and the existence of a contract between the parties precludes voluntariness. *Flagship Marine Services v. Belcher Towing Company,* 966 F.2d at 602, 605–06 (11th Cir. 1992); *Cargill, Inc. v. M/T Pacific Dawn,* 876 F.Supp. 508, 511 (S.D.N.Y.1995) (no salvage lien exists because the service provided was not voluntary); *Atco, Inc. v. Disch Construction,* 1993 A.M.C. 2195, 1992 WL 230482 (S.D.N.Y.1992); *Taylor v. Ahmendnager Queen,* 1998 A.M.C. 2631 (N.D.Cal.1998). In a contract situation the service is performed under the obligations of the contract. *Cf. Clifford v. M/V Islander,* 751 F.2d at 5 ("[o]ral maritime contract . . . would be considered a 'special contract', creating a duty to assist and rendering Clifford's services 'non-voluntary'."). The contract must be "to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful. . . ." *The Camanche,* 75 U.S. (8 Wall.) 448, 477, 19 L.Ed. 397, (1869); *see also, Nunley v. Dauntless Colocotronis,* 863 F.2d 1190, 1201–02 (5th Cir., 1989).

## THE "OFFER"

At approximately 1840 [4] on June 1, 1994, the MANTINIA, laden with 314,273 barrels (1,319,947 gallons) of black oil cargo, ran aground outside Guayanilla Bay, Guayanilla, Puerto Rico (App.1847–1853).[5] At approximately 0521 hours on June 3, 1994, the vessel was successfully refloated. The condition of the weather and the sea bottom during the pertinent period are disputed by the parties. The crux of the arguments was not whether there was peril, which was conceded by the defendants,[6] but rather its severity or extent, a matter which will be discussed subsequently. Shortly after the MANTINIA grounded, pursuant to their contractual obligation to use SMIT as their "preferred salvage contractor," [7] METRO directed their QI, WILLIAMS, to alert SMIT to request their assistance, and to ascertain from SMIT if it had any salvage vessels or tugs available (App.1751, 1763–74). WILLIAMS, after several calls to the SMIT "hot line," spoke with SMIT's CHIANNELLI shortly after midnight. WILLIAMS requested that SMIT provide "appropriate assistance" (App.1766) and CHIANNELLI recommended sending a SMIT salvage master and a naval architect (App.1049–50). CHIANNELLI also advised that SMIT had no salvage vessels or tugs available in the area (App.1051, 1052). After speaking with WILLIAMS and making his recommendations, CHIANNELLI relayed METRO's request for assistance to his superior, HOOGENDORN, who then composed a fax to METRO setting forth a proposal for services sent at 0230

---

4. All times are Atlantic Standard Time. Times for events occurring elsewhere have been converted to Atlantic Standard Time.

5. The cites are to the Joint Appendix.

6. "In the instant case defendant, UNDERWRITERS, does not dispute that the MANTINIA was in *some* peril as she lay aground in the Mogote." (Underline supplied). UNDERWRITERS Trial Brief, P.6.

7. Pursuant to the Oil Pollution Act of 1990 (OPA 90) and Coast Guard regulations issued thereunder, all tankers trading in United States waters were required to "ensure the availability of, through contract or other appropriate means . . ., a salvage company with expertise and equipment." 33 C.F.R. § 155.1050(k)(1). Accordingly, SMIT and owners entered into a service agreement whereby SMIT was to provide oil spill response services as a "preferred salvage contractor."

June 2, 1994 which, in pertinent part, states as follows:

> We refer to our previous telcons...with regard to the provisions of services by SMIT AMERICAS under the agreement covering OPA '90 requirements [i.e., the Smit Contract].
>
> * * * * * *
>
> We understand that at present you would like us to mobilize a salvage master to the site as soon as possible, but you do not want us to respond with a full package as per the terms under OPA '90 requirements. We would like to inform you that we are in a position to offer the **service of our salvage master** (Mr. Ted Hosking) as follows:
>
> 1) Flying by charter, ETA Puerto Rico between 1300 and 1400 hours. Estimated cost for charter U.S. $12,000.
>
> 2) Flying by commercial airline, ETA Puerto Rico tomorrow evening.
>
> We are in a position to offer these services based on following rates:
>
> | | |
> |---|---|
> | Salvage Master | $1,250 / day |
> | Travel, lodging | at cost + 15% |
> | Other Costs | at cost + 15% |
>
> We also would like to inform you that **we will await further notice if any additional action is required** and that we will stand-by to commence mobilization of lightering and other required equipment as soon as such notification has been received by us, **terms to be agreed upon**.

(App.1491–92) (emphasis ours).

The terms of this offer were accepted by METRO and constitute the contractual basis for SMIT's deployment of its salvage master, HOSKING, from Houston, Texas, to Guayanilla, Puerto Rico, who boarded the MANTINIA at approximately 1800 hours on June 2, 1994 (App.1663). It is also the source of the controversy between the parties as to the precise role played by HOSKING during the successful refloating operation.

## DISCUSSION

■ The issue at this point is whether the services performed by HOSKING while he was on board the MANTINIA in June 1994 entitle SMIT to a salvage award. METRO/WOE and UNDERWRITERS' contention is that all the services performed by HOSKING which culminated in the MANTINIA's refloating were rendered pursuant to the terms of the Response Agreement and therefore, were not voluntary. SMIT, on the other hand, argues that the Response Agreement merely required it to provide advisory services and inasmuch as HOSKING's role in refloating the MANTINIA went well beyond that, to that extent, his services were voluntary.

WOE/METRO and UNDERWRITERS do not deny that HOSKING directed the successful salvage operation. However, they contend, that is what he was hired to do. They rely upon the offer of "the service of our salvage master (Mr. Ted Hosking)" in the Response Agreement to be inclusive of all HOSKING could do. SMIT contends that its offer unambiguously defined the "service" as no more than sending HOSKING to Puerto Rico, either by charter or commercial air, leaving "terms to be agreed" with respect to any further action that may be required.

The defendants suggest the language in the aforementioned contract is ambiguous and must, therefore, be given an interpretation adverse to SMIT, the party who drafted it. SMIT disagrees and points to evidence which contradicts defendants' position. In particular SMIT cites undisputed statements about the Response Agreement made by both METRO and HUDSON. According to the deposition testimony of GEORGES of NSTC SMIT

was retained to "evaluate the situation... prepare a salvage plan to **advise** the master... **advise** on how to refloat the vessel most effectively and as soon as possible." (App.0373) (emphasis ours). Further, CYNTHIA, the President of HUDSON, specifically acknowledged that the "intent in explaining that an advisory capacity should be utilized was to differentiate between SMIT directing and controlling an operation, using their own equipment, or using other's equipment with them at the direction or control position; that they would be providing advice to the owner and **advice only**." (App.1281) (emphasis ours). SMIT further notes that CYNTHIA instructed HUDSON personnel to hire SMIT "only in the capacity of an **advisor**." (App.1280) (emphasis ours).

SMIT also calls attention to three telefaxes it sent to METRO/HUDSON which specifically address the distinction between the two roles. At 1241 on June 2, SMIT transmitted a telefax noting the mutually exclusive roles of serving solely as an **advisor** or serving as a **salvage contractor**. (App.1519) (emphasis ours). At 0019 on June 3, SMIT sent a telefax expressing concern about the confused roles on site, reminding METRO/HUDSON that SMIT was contracted only to act as an advisor. (App.1573) (emphasis ours). At 0256 on June 3, SMIT reminded METRO/HUDSON again that it was hired only in an advisory capacity and offered to change from an **advisory** role to that of a **salvage contractor** under LOF terms. (App.1582–4) (emphasis ours). SMIT notes that METRO–HUDSON never disclaimed SMIT's characterization of its role in response to these messages.

It is also helpful to review the communications between SMIT and METRO/HUDSON which eventually culminated in the Response Agreement in the proper context, that is, as explained by the witnesses who participated directly in those exchanges to further understand the intent of the parties to the contract. The first call to SMIT came from WILLIAMS, an employee of HUDSON and the person assigned as Qualified Individual. WILLIAMS testified to some frustration with the initial delay incurred in reaching someone at SMIT with whom to deal. Nonetheless, WILLIAMS eventually spoke to CHIANNELLI, SMIT's Logistics Manager in Galveston, Texas. (App.0247) From that conversation, CHIANNELLI understood the MANTINIA was aground on soft mud in the harbor of Guayanilla, Puerto Rico, and in no particular peril. (App.0248) Further, he understood SMIT was being requested to ascertain the personnel needed on scene to assess the situation so that SMIT could respond with the proper package. (App. 0252–53) Initially, SMIT and HUDSON discussed sending both a salvage master and a naval architect to the site, but METRO/HUDSON decided at that stage they required only a salvage master. (App.0251,0255) CHIANNELLI relayed this exchange to his superior HOOGENDORN, who then sent the message cited previously which constitutes the "offer" in the Response Agreement and served as the initial contractual basis for their relationship. HOOGENDORN sent the offer directly to METRO, bypassing WILLIAMS/HUDSON. (App.1491–92)

METRO/NSTC informed WILLIAMS of SMIT's "offer", and instructed him to accept it, selecting the option that HOSKING proceed to Puerto Rico on a charter flight to expedite the time of his arrival on site. (App.0370) Although WILLIAMS had not seen SMIT's written "offer", he informed CHIANNELLI of METRO's acceptance. (App.0255) Arrangements were then made by SMIT, in accordance with the offer and acceptance, for HOSKING to be moved by helicopter from the salvage

operation on which he was engaged to the airport in New Orleans, where he would catch a charter flight to Ponce, Puerto Rico, and from there he would be transported to the MANTINIA.[8]

### THE OFFER AND ACCEPTANCE

The service SMIT was to provide pursuant to its written offer was, if taken literally, no more than to send HOSKING to Puerto Rico. If SMIT or HOSKING were to do anything more, that would be on "terms to be agreed upon." That is clear and unambiguous. It also makes sense in that SMIT, and apparently METRO as well, understood the MANTINIA to be aground on soft mud and that she may be refloated by the time HOSKING reached Puerto Rico. (App.0255–0256)

The facts support a finding that the parties operated under an understanding that SMIT would provide advisory services via HOSKING, i.e., the parties agreed to more than a literal reading of SMIT's offer would require. CHIANNELLI and WILLIAMS acknowledge the agreement was for HOSKING to serve in an advisory capacity. That understanding is memorialized by both SMIT and METRO/HUDSON in subsequent records and correspondence, both before and after the salvage efforts were successfully completed. GEORGES' (of NSTC) log entry clearly states the nature of the services WILLIAMS was instructed to accept. It reads: "Smit has ready salvage services in an **advisory** capacity **or salvage**, in which case will be LOF -No cureno pay. Decided to use only their advisory services...." (App.1735) (emphasis ours). As both WILLIAMS and CHIANNELLI had the same understanding of what they agreed, with GEORGES' acknowledgment of what METRO wanted, no ambiguity was intro-

duced into the Response Agreement by this departure from a literal reading of SMIT's offer. It follows that SMIT was contracted to provide only advisory services.

There is another consideration of circumstantial evidentiary value which is of interest to the Court and that is SMIT'S role and experience as part of a large international salvage organization. (App. 110) SMIT and its worldwide affiliates support numerous employees and vessels, and maintain specialized marine salvage equipment on a ready response status. (App. 0115) HOSKING's mobilization on short notice from an ongoing salvage operation to another casualty site is an example of how SMIT functions. The services provided by SMIT are valuable, not only for saving property, but also in rescuing vessels in such a way as to eliminate threats of oil spills and their serious consequences.

SMIT could not subsist as a viable business providing comprehensive salvage services by merely sending individual salvage masters to conduct salvage operations for modest remuneration. It is illogical to consider that SMIT would expose itself to the risk of enormous liabilities in the process. The defendants acknowledge SMIT's sophistication in this business is such that it would be expected to use care in its commitments. The Court agrees, and finds SMIT meant what it said in HOOGENDORN's fax sent on June 2, 1994, i.e., "We are either engaged in an **advisory** capacity **or** to supervise the refloatation and lightering as the **primary contractor**." (App.1525) (emphasis ours). METRO had the option of a salvage contract, but declined it while nevertheless pressing HOSKING to perform salvage services under an advisory agreement.

---

**8.** HOSKING was located on another salvage job in the gulf of Mexico. SMIT determined he could be freed from that operation to travel to Puerto Rico. (App.0255–0256)

The defendants suggest the *per diem* rate charged pursuant to the Response Agreement is a fair rate for HOSKING to perform salvage because that is the rate listed in SCOPIC for a salvage master. The SCOPIC clause is supplementary to a Lloyd's Form Salvage Agreement "No Cure–No Pay". (App.2398–A) SCOPIC has many other provisions, not least of which is that it is tied inextricably to the LOF salvage contract. (App. 2398–A through O) The LOF contract was repeatedly offered to METRO by SMIT, and METRO repeatedly refused. The Court finds it somewhat ironic that defendants would now seek to use a provision of the LOF salvage contract to defeat SMIT's claim for a salvage award.

## THE PERIL

■ When HOSKING boarded the MANTINIA he found the vessel in substantially different circumstances than had been understood by CHIANNELLI when initially contacted by WILLIAMS. In a report subsequently prepared by HOSKING and in his deposition he related that while on board the MANTINIA he noticed the vessel was pounding on a hard coral bottom such that he had to hold on to something to maintain his balance. The seas and swells were increasing in size and the situation was worsening. According to HOSKING, he could look from the bridge of the vessel and see the bow flexing, and the masts were shaking as the vessel pounded. (App.0022, 1804–7)

The defendants do not agree the circumstances were as dire as described by HOSKING. They pointed to evidence which arguably shows HOSKING exaggerated the then existing conditions. UNDERWRITERS devoted a substantial portion of their brief to addressing the dispute over the nature of the sea floor, the state of the weather, sea conditions, motion of the vessel and other issues in order to assess the degree of peril to which the vessel was exposed. They nonetheless, as stated, admit to the existence of a peril, only disagreeing with the degree of that peril.[9]

The two Coast Guard officers on board the MANTINIA, ROQUE and BENNINGFIELD, gave descriptions of the vessel's motion. BENNINGFIELD testified in his deposition that the MANTINIA was bouncing to the point her masts were vibrating, and doing so in a way that made him "nervous". (App.0849, 0853) He had the same reaction as HOSKING, saying the vessel's pounding caused him to bounce, and his reflex was to grab hold of something. (App.0853) Further, he noted that the bouncing caused the vessel to vibrate in such a manner that he could not nap when relieved from duty (App.0813) and he was concerned that if this continued, at some point the vessel would break and there would be an oil spill reminiscent of the tank barge MORRIS J. BERMAN on the north coast of Puerto Rico the year before. (App.0813–0814) According to BENNINGFIELD the MANTINIA "would bump, and a heavy bump, maybe every third or fourth interval to where after the vessel would hit bottom, you could just feel the vibration going all the way through the mast, I mean to where you could actually feel the mast rocking. So she was bouncing pretty good." (App. 0837) Additionally, he noted that "when she hit, she hit hard enough to -where the natural reaction would be to grab something". (App.0853)

ROQUE testified that at intervals of five to fifteen minutes the impact of the vessel with the sea floor was hard enough to cause the vessel to shake and shudder.

9. *See* Footnote 5.

(App.0937) He described the situation as follows:

> The bow was pitching up and down and moving slightly port to starboard, starboard to port, depending on the seas... The vessel would... float up and then she would come back down and shudder.

(App.0935, 0937)

The local tug captains, Hiram Padilla (App.1728) and Ernesto Irizarry (App.1740), also record a coral bottom and swells of up to 10 feet and winds of up to 30 knots during the evening of June 2 and early a.m. on June 3. (1728, 1739–1740) The coral bottom is also confirmed in ROQUE's testimony of seeing whitish residue in the water all along the starboard side of the vessel after she would shake and shudder. (App.0961–0962)

The degree of peril and the concern it caused is also captured in a message sent by CYNTHIA to her colleague, Mr. Michael Garnett, on June 2, 1994 which reads:

> Although there has been no oil spilled to this point, it looks like we have the potential for a big one. We are all in the office at this point, trying to stay one step ahead in case this "puppy" decides to break open.

(App.1550)

A similar evaluation is arrived at somewhat differently by the Coast Guard. In their pollution reports ("POLREPS"), the Coast Guard referred to the risk as small, but acknowledged there existed the potential for a major oil spill. (App.1497, 1566) ROSS testified in his deposition the probability of a major spill increased with the passage of time. (App.0745) The Coast Guard also reported to HUDSON they considered this grounding posed a serious threat of a discharge. (App.1560) ROSS, in a communication to the Commandant of the Coast Guard after the vessel had been refloated, suggested the expense of an oil spill response if the MANTINIA had broken up might have been enormous and opined:

> I am not at all comfortable with the thought of playing chicken with an environmental disaster and a $1B+ cleanup because an owner and/or his insurer hope to avoid a few million dollar salvage award.

(App.1928)

The Court also considers the damage caused to the vessel's bottom during her period aground at Guayanilla. The defendants rely on the reports of a diving inspection conducted in Guayanilla shortly after the vessel was refloated, (App.1616) and a Coast Guard inspection conducted in St. Croix after the vessel departed Guayanilla. (App.1865) However, they have not produced the witnesses who prepared those reports so it is not possible for this Court to assess the extent of and thoroughness of either of those inspections. The extent of the damage found when the vessel was put on drydock in Malta in March 1995 (nine months later) is telling. When on drydock, the MANTINIA was found to require in excess of $2 million dollars to repair bottom damage, which included heavily indented steel plating, buckled internal framing, and damage to her rudder, skeg, and other hull appurtenances. (App.1875–1896) METRO and UNDERWRITERS attributed this damage entirely to the grounding at Guayanilla, (App.1867, 1894) and GEORGES testified that all the damage occurred during this grounding incident. (App.0441–0447)

Courts have found that the measure of the peril to which a vessel was subjected is not essential to a decision reached on the issue of voluntariness. It is enough that marine peril existed. *See Navigazione Generale Italiana v. Spencer Kellogg & Sons, Inc.,* 92 F.2d 41, 44 (2nd Cir.1937)

(Hand, Learned, J). (When a vessel is stranded she and her cargo are practically always in a substantial peril; such a vessel is helpless because she cannot pursue her intended voyage or deal effectively with any emergency *which may arise*). (Underline supplied).

 "It is not necessary that the distress should be actual or imminent or absolute, but it is sufficient if, *at the time* the assistance is rendered the vessel has encountered any damage or misfortune which *might possibly* expose her to destruction if the services were not rendered." (Underline supplied). *The Saragossa*, Fed. Cas 12,334 (DC SD N.Y. 1867); *see also*, *Lambros Seaplane Base, Inc. v. The Batory*, 215 F.2d 228 (2nd Cir.1954). A vessel driven aground, on rocks, shoals, or reefs must be considered as in a state of peril. Exposed as she is to wind, weather and waves it does not generally require extensive reflection to realize that so long as she remains in that hapless condition further damage and eventual breaking up may ensue. *The Laura* (1871) 81 U.S. 336, 14 Wall. 336, 20 L.Ed. 813. It is not essential in order to constitute a salvage service that the danger be immediate or absolute. It is sufficient that at the time the assistance is rendered, the ship has encountered any danger or misfortune which *might* expose her to destruction if the service were not rendered. A situation of *reasonable apprehension*, though not of *actual* danger is *sufficient*. (underline supplied.) *The Plymouth Rock*, 9 F. 413 (S.D.N.Y.1981). This court would add an analogy: being on board a grounded single hull vessel laden with 1,319,947 gallons of oil on a substance which causes it to pound or shudder is akin to being locked in a room with a 900 pound gorilla.

There is no lessening of apprehension because it appears to have a benign expression on its face. Thus, this Court finds that, at the time HOSKING's services were rendered, the MANTINIA was in peril.

## THE SERVICES OF HOSKING

 HOSKING testified that while proceeding from the dock to the MANTINIA on June 2, 1994, he observed the tug MARINER, owned by Crowley Maritime, pushing an oil lightering barge. He was familiar with the 9000 horsepower MARINER, with which he had worked on in the past. (App.0018) Once on board the MANTINIA, he realized the ship was in a "very, very dangerous situation using those two tugs with those mooring ropes and the mooring ropes wouldn't have lasted long any way." He believed an effort should be made using the MARINER in a stern pull to refloat her before going to a more complicated lightering plan.[10] (App. 0036–39)

HOSKING testified that he contacted the manager of the tug, and asked about the availability of the MARINER. (App. 0039) Crowley then contacted METRO/NSTC, and the contract for use of the MARINER was amended so she could be used as a pulling tug in the salvage operation rather than simply to tow the lightering barge as previously contemplated. (App.1754, 1564)

SOURALIS, the master of the MANTINIA, testified that even before HOSKING arrived, he had already alerted METRO/NSTC of the MARINER's presence, requesting NSTC to contact Crowley to make arrangements for her use in a pulling effort. SOURALIS' claim cannot be

---

10. Lightering in any event would have been difficult because of the MANTINIA's clogged ballast water system. (App.1566, 1745)

substantiated. GEORGES' log indicates he was contacted by Crowley, not the other way around. Further, the timing of this contact is consistent with the following HOSKING's report of the events.

> 6:50 Crowley advised me that they have the tug "Mariner" of 9500 hp that was escorting the barge available for use but they need a contract signed on a $20,000 per diem, minimum 2 days or $40,000 before the tug is used. I agreed.

(App.1754)

Moreover, contrary to SOURALIS' claim that it was his idea to use the MANTINIA in a pulling effort, as late as midnight on June 2, the captain was still insisting on another refloating effort using only the small harbor tugs, without using the MARINER. (App.1497)

HOSKING testified that at some point he took "command" of the MANTINIA, and he thereafter performed the salvage operation with regard to which this dispute arises. (App.0027) SOURALIS, on the other hand, says that if HOSKING had attempted to take command of his vessel he would have had HOSKING taken off the vessel by the Coast Guard.[11] (App. 0522) However, the term taking "command" was apparently being utilized by each one in a different context, i.e., total command of the entire ship operations versus total command of the salvage operation.

What is essential, in any event, is who conducted the salvage operation which resulted in the safe refloating of the MANTINIA. It is clear beyond doubt, HOSKING took charge and employed his experience and skill to refloat the MANTINIA. This is corroborated by BEN-

NINGFIELD, who testified that in the fifteen to twenty minutes he was on the bridge just before the refloating, HOSKING was directing the salvage operation. (App.0829) Both Captain Padilla (of the tug OSCAR P), and Captain Irizarry (of the tug GUSTAVO P) also stated that all instructions to the tugs were given by the salvage master. (App.1729, 1739) Furthermore, the log of the tug MARINER confirms that she started her pulling effort at the direction of HOSKING. (App.1691–92) This evidence from third-party witnesses is conclusive that HOSKING directed the successful refloating of the MANTINIA. SOURALIS himself admits the orders to the tugs were given by HOSKING (App.0614, 0615), though he appears to claim these were actually his own orders relayed through HOSKING, (App.0524). The Court finds this version not credible. SOURALIS admitted that he made no calculations as to the force i.e. horsepower that would be required to refloat the ship during the maneuver (App.0607, 0608) and had no idea whether the MARINER would be pulling or pushing on the hawsers (App. 0612). Thus, the evidence overwhelmingly confirms HOSKING's version and the court finds that HOSKING actively took control of and directed the salvage of the MANTINIA.

### VESSEL OWNER'S CONSENT

■ Defendants have raised the issue of whether METRO consented to HOSKING doing more than serving in an advisory capacity. From the record, it is certain that METRO/HUDSON did consent mainly because it had no choice but to do so in order to be in compliance with the FOSC's orders.

---

11. These statements would appear to include some exaggeration on the part of both, perhaps resulting from the highly personal dispute which arose between them while they were on the MANTINIA. (App.0833, 0834, 0974)

ROSS, after receiving a call from WILLIAMS describing HOSKING's proposed plan, "...told Cdr. Williams, 'Do it'. And it wasn't a 'you have permission to do it' as much as it was 'I am ordering you to do it.'" (App.0651) HOSKING was then instructed by HUDSON, with the consent of NSTC and the FOSC, to proceed with his plan.

In this regard the Situation Report No. 1 prepared by HUDSON states:

> At approximately 2000, the Salvage Master recommended the barge be secured and the tug Mariner, in conjunction with other tugs on-scene attempt to once again pull on the vessel (in light of its movements on the strand and the soft mud bottom). Following consultation with the operator, the FOSC and the P & I correspondent the Salvage Master was advised to proceed.

(App.1588)

This understanding was also summarized in HUDSON's fact sheet, i.e. "Smit will attempt another try at pulling the vessel free at the 0500 high tide..." (App. 1600) GEORGES also recorded in his log that he instructed SOURALIS to cooperate with the salvage master and the others who would be working on this problem in a team approach, at a time when SOURALIS had called him suggesting another attempt be made to refloat the vessel using the small harbor tugs, without waiting for the MARINER's towing gear to reach the site. (App.1755–1756) Finally, SOURALIS admitted that HOSKING gave the orders to the tugs (App.0524) pursuant to a plan devised by HOSKING and consented to by the captain. (App.0611)

### TIME OF TAKING CHARGE

There is an issue as to what time HOSKING took charge. This is not of direct relevance to the voluntariness of his doing so, but helpful in understanding the necessity of his taking charge. HOSKING testified that he took charge at about 2300. (App.0027) However, there is evidence he took charge earlier, perhaps as early as 2000. Under the circumstances, what appears to have occurred is he took charge in stages. This began about 2000 when HUDSON instructed him to carry out his plan, (App.1588) and his control was solidified after speaking to GEORGES at about 2350. (App.1755–56) In fact, GEORGES' 2350 log entry records the instructions he gave SOURALIS which would have caused SOURALIS to behave just as HOSKING has reported he did, i.e. acquiescing in HOSKING's control of the salvage operation.

> The master has called several times -is very nervous and makes suggestion to use what tugs are there to try to pull the vessel. He advised that *he wants to do it as master.* I told him that everything he does must be first discussed with the salvage master, Coast Guard, QI. and attorneys and if they approve it, then to do it otherwise to follow their recommendations.

(App.1755–1756) (emphasis added).

Neither of the coast Guard officers witnessed HOSKING actually taking charge. At least one of them was present when HOSKING and SOURALIS were having strong disagreements on what should be done. (App.0974) That is not, however, indicative of who was in charge of the salvage operation at that time. *See South American S.S. Co. v. Atlantic Towing Co.,* 22 F.2d 16 (5th Cir.1927) (salvage was found even though the salvage master was not even on board the vessel). The Coast Guard officers were on board the vessel to address pollution concerns and had no role in planning or executing the salvage effort, except insofar as it might result in an oil spill. (App.0823, 0964, 0966) Moreover, the testimony of both officers indicates

neither was on the bridge for substantial periods of time from about midnight June 2 until shortly before the vessel was refloated early on June 3. (App.0813, 0815–0816, 0954)

However, during one of the disputes between HOSKING and SOURALIS, BENNINGFIELD paraphrased HOSKING's complaint to the master that, "I can't do my job if you are not going to let me...", that job being -"to safely refloat the vessel." (App.0836) By that time, HOSKING was in the process of taking charge of the salvage operation and was protesting SOURALIS' interference in that effort. That would be consistent with the instructions given to the captain by HUDSON at 2000, the "about 2300" time HOSKING said he took charge, (App.0027) and GEORGES' 2350 instructions to SOURALIS not to do anything unless approved by the salvage master. (App.1755)

About 15 to 20 minutes before the vessel was refloated, BENNINGFIELD came to the bridge, and he observed that HOSKING was directing the tugs and the refloating operation.

Q. Mr. Benningfield, at the time that you were on the bridge at 15 minutes or so before the vessel was refloated, who was directing the salvage operation?

A. Directing it?

Q Yes.

A. It would have been the salvage master. It was the salvage master, I am sorry.

(App.0829)

The Court finds that HOSKING began serving beyond the advisory scope of the Response Agreement some time about 2000, and that he took full charge of the salvage of the MANTINIA at 2350.

## THE RESPONSE AGREEMENT AND VOLUNTARY SALVAGE SERVICES

 The Court finds that SMIT was contracted, and HOSKING was sent, to provide advice in developing a salvage lightering plan on a vessel that was lightly aground on a soft mud bottom, and not in any particular peril. Instead, HOSKING provided a substantially different type of assistance in refloating a vessel that was hard aground outside the harbor and admittedly in peril. This assistance was beyond that for which SMIT had been contracted. HUDSON and WILLIAMS agree to that, as do HOOGENDORN and CHIANNELLI. In a letter sent to the FOSC after the MANTINIA was refloated, WILLIAMS declared that:

Ted Hosking, without the requisite contractual authority sought by salvage companies (he was an advisor/consultant at the time), accepted full responsibility (and liability) of a Salvage Master and directed the pulling effort that released the M/T MANTINIA from the strand.

(App.1897)

WILLIAMS confirmed this when he was called to testify at his deposition. (App. 1234) These uncontroverted statements show that the agreement was limited to advisory services, and did not provide for the performance of salvage. There is no doubt that HOSKING actually directed the successful salvage operation. These services were beyond SMIT's duties and obligations under the Response Agreement pursuant to which HOSKING was sent aboard the MANTINIA.

The facts, as admitted by METRO/WOE and UNDERWRITERS, show the Response Agreement does not "...enclose the entire undertaking...", *Lago Oil Transport.* It did not address specifically, or even at all, the most important services HOSKING provided. There are many

cases in which pure salvage claims have been denied because the claimants had in fact contracted to perform salvage, or had otherwise been obligated to perform salvage or were not entitled to an award on other grounds. Defendant's counsel have been most helpful in bringing some of the most important of these to the Court's attention. However, the Court finds that the Response Agreement was not such a contract, and it did not require SMIT to perform salvage.

Moreover, the Response Agreement was entered into based on an inaccurate perception of the situation into which HOSKING was being sent. This is clear from the deposition testimony of CHIANNELLI, (App.0248) as well as from SMIT's offer itself and METRO's response thereto. The parties to the agreement understood the MANTINIA to be softly aground, which the evidence subsequently contradicted. That mistake might be sufficient to vitiate the agreement if it had in fact required SMIT to perform salvage. *See, e.g., Hashway v. Ciba–Geigy Corp.,* 755 F.2d 209, 211 (1st Cir.1985); *O'Rourke v. Jason, Inc.,* 978 F.Supp. 41, 45–47 (D.Mass.1997). However, the Court need not decide that issue because no such service was required by the Response Agreement. The Response Agreement was not a salvage contract, and therefore it cannot bar SMIT's meritorious salvage claim.

## WAIVER AND ESTOPPEL

■ METRO/WOE and UNDERWRITERS contend that SMIT never informed anyone that HOSKING's status had changed from a contracted advisor to voluntary salvor. Thus, they argue, this Court should deny SMIT's salvage claim, because SMIT concealed material facts or made misrepresentations that it knew were untrue. To substantiate their defense, METRO/WOE and UNDERWRIT-

ERS refer to three telefaxes sent by SMIT to HUDSON, showing that SMIT continued to confirm that HOSKING was acting in an advisory role. The insurers cite two cases for this proposition, *United States v. Ex–USS CABOT/DEDALO,* 297 F.3d 378 (5th Cir.2002), and *The Trinidad,* 1926 A.M.C. 63, 10 F.2d 849 (D.Or.1925).

We find these cases inapposite. In *The Trinidad,* the court denied a salvage claim because towing services were imposed deceptively, after being rejected by the owner. In *Ex–USS CABOT/DEDALO,* the court denied the salvage claim of the U.S. Coast Guard because its services were imposed on the owner pursuant to its statutory authority to prevent pollution. The statute afforded the owner no opportunity to refuse the Coast Guard's services. These cases do not advance the defendants' estoppel defense because SMIT's services were not imposed on the owner of the MANTINIA. In fact, as explained above, METRO and HUDSON consented to HOSKING performing salvage. They even directed him to do so, despite SMIT's reminders that he was there in an advisory capacity.

■ To succeed with a defense of estoppel a defendant must show: 1) the party to be estopped knows the facts; 2) the party to be estopped intends that its conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is intended; 3) the party asserting estoppel must be ignorant of the true facts; and 4) the party asserting the estoppel must rely on the former's conduct to its injury. *See Plumley v. Southern Container, Inc.,* 303 F.3d 364, 374 (1st Cir.2002). The defendants do not meet these criteria.

The defendants base their estoppel defense on a claim that SMIT distorted its intentions by asserting it was still operating under the advisory agreement after

HOSKING was engaged in salvaging the MANTINIA.[12] They bolster the argument by alleging that SMIT's Operations Manager, HOOGENDORN, was fully informed of what was occurring aboard the MANTINIA through his phone conversations with CHIANNELLI. Thus, the defendant allege, HOOGENDORN knew of HOSKING's salvage actions when he sent the telefax stating SMIT was still operating under the advisory agreement. Defendants argue these telefaxes constitute a misrepresentation by SMIT.

SMIT, on the other hand, argues that HOOGENDORN's June 3, 1994 telefax was sent as a further reminder of the contractual limitations. According to SMIT, HOOGENDORN was concerned that more was going on than would be covered by the Response Agreement. HOOGENDORN testified that a conversation with WILLIAMS alerted him to the fact that SMIT was probably taking on more liabilities, whether the owners liked it or not, and regardless if the owners confirmed the additional liability. HOOGENDORN worried that SMIT's Salvage Master was on board a vessel aground in a fairly dangerous situation, and the owners may have been hemming SMIT into a position where the salvage company had to take action exceeding that agreed in the Response Agreement in order to maintain SMIT's reputation and to protect its exposure to liability.

The facts do not support the defendants' estoppel argument. Whether CHIANNELLI or WILLIAMS informed HOOGENDORN of the actions being taken by HOSKING on board the MANTINIA, the telefax clearly alerted METRO, who already knew through NSTC and HUDSON what was going on, that SMIT was taking on more responsibility and risking greater liability than the Response Agreement required.

Furthermore, METRO/WOE and UNDERWRITERS cannot invoke a defense of estoppel because at no time did SMIT, through words or conduct, misrepresent or conceal material facts or make representations that it knew were untrue. SMIT presented its actions openly. The Court finds, as stated above, that SMIT was hired solely in an advisory capacity. The evidence shows that HOSKING implemented and directed the successful salvage operation. METRO accepted the salvage services despite being clearly advised they were outside the scope of the Response Agreement, and never complained until the claim for salvage was presented.

HOSKING provided valuable and substantial services and the MANTINIA was thereby safely salvaged. Even assuming METRO had ordered HOSKING off the MANTINIA in response to SMIT's reminders of the advisory nature of the Response Agreement the Court finds, on the basis of ROSS's frequently expressed concerns as FOSC, ROSS undoubtedly would not have allowed HOSKING's removal. Moreover, under the precarious circumstances at the time, HOSKING may have declined to obey such an order. In the event that HOSKING had not received permission to refloat the MANTINIA, he may have done so anyhow, as long as a prudent man would have accepted the services he could provide. *Merritt & Chapman Derrick & Wrecking Co. v. United States*, 274 U.S. 611, 613, 47 S.Ct. 663, 71 L.Ed. 1232 (1927); *New Bedford Marine Rescue v. Cape Jeweler's, Inc.*, 240 F.Supp.2d 101 (D.Mass.2003). It is clear from the testimony of the Coast Guard

---

12. This suggests the defendants did not know HOSKING was performing salvage and had they been informed HOSKING was operating beyond the scope of the advisory agreement they would have instructed HOSKING to leave the MANTINIA.

personnel, the movements of the stranded vessel, and the potential for an environmental catastrophe, a prudent man would have accepted the salvage services of SMIT and HOSKING.

It has also been held that the owner's right of refusal is limited in situations involving "imminent danger of large losses of the property of third persons." *The Pohatcong*, 77 F. 996, 997 (D.C.N.Y.1896). *See also Int'l Aircraft v. Unidentified, Wrecked and Abandoned Aircraft*, 218 F.3d 1255, 1262 n. 14 (11th Cir.2000). Therefore, even assuming SOURALIS, acting on behalf of the vessel's owners, had rejected salvage HOSKING would still be entitled to an award if there was an imminent ecologic disaster which rendered the captain's refusal "palpably and so grossly wrong as to amount to positive misconduct in reference to the claims of humanity, or the property interests of other, so as legally to justify intervention against his will." *The Pohatcong*, 77 F. at 997. *See also*, Martin J. Norris, The Law of Salvage, § 115 p. 198 (Baker, Voorhis & Co., Inc. 1958).

Given the circumstances the Court has found existed at relevant times, the limitations of the Response Agreement as an advisory contract only, and the action taken by HOSKING with the consent and at the direction of METRO/HUDSON despite reminders from SMIT, the defendant's effort to avoid a salvage claim on the basis of waiver or estoppel must fail.

## CONCLUSION

An objective analysis of the uncontroverted material facts and evidence on record shows that SMIT has satisfied all the requirements of salvage. First, the MANTINIA was in a state of marine peril. The parties have devoted substantial portions of their briefs discussing the severity of the weather and sea conditions and the nature of the sea floor at the grounding site. Whatever their differences on severity, they are unanimous: there was peril. Second, HOSKING's actions were voluntary. He performed services that were outside of the scope of the Response Agreement, and those services resulted in the safe refloating of the MANTINIA. HOSKING was directed to perform these services by the MANTINIA's qualified individual, and the MANTINIA's master and owners acquiesced in his performance of these services. Finally, the MANTINIA and her cargo were safely and successfully salvaged by HOSKING taking voluntary actions above and beyond any required of him by the Response Agreement. The Court concludes that, as a matter of fact and law, SMIT is entitled to a salvage award.

It is therefore ORDERED and ADJUDGED that SMIT and its employee HOSKING have met the criteria required to be entitled to a salvage award.

Counsel for the parties shall file a **JOINT MOTION on or before June 2, 2003** submitting their respective suggestions on how to move forward to complete the trial of this matter in order to determine the manner of proceeding with respect to the quantum of SMIT's award.

IT IS SO ORDERED.